Filed 5/25/16 opinion on rehearing

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ADAM CORNEJO et al.,<br><br>    Defendants and Appellants. | C072053<br><br>(Super. Ct. No. 11F00582)<br><br>OPINION ON REHEARING |

APPEAL from a judgment of the Superior Court of Sacramento County, Cheryl Chun Meegan, Judge.  Affirmed in part and reversed in part with directions.

Audrey R. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant Adam Cornejo; Eric Weaver, under appointment by the Court of Appeal, for Defendant and Appellant Jesse Cornejo; Ann Hopkins, under appointment by the Court of Appeal, for Defendant and Appellant Isaac Vasquez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Michael P. Farrell, Assistant Attorneys General, Eric L. Christoffersen and Ivan P. Marrs, Deputy Attorneys General, for Plaintiff and Respondent.

Deandre Ellison was shot to death as he drove into his driveway in the Del Paso Heights neighborhood of Sacramento. Four other men, including Latrele Neal, were also in Ellison's car. Before the car came to a stop in the driveway, an SUV driven by Jesse Cornejo slowly drove past Ellison's house; the SUV's front and backseat passengers, Adam Cornejo and Isaac Vasquez, opened fire on Ellison's car.[1] Neal managed to return fire with Ellison's gun before the SUV drove away. About 20 bullets were exchanged between the vehicles. Bullets also struck Ellison's house. Ellison was the only casualty. After crashing the SUV while being pursued by law enforcement, Adam, Jesse, and Isaac were taken into custody a short time later. Each was a Norteño gang member. Isaac was 16 years old with a developmental disability; Adam and Jesse were 17 and 18 years old, respectively.

Adam, Jesse, and Isaac were tried together and convicted by jury of one count of second-degree murder (Pen. Code, § 187, Count One),[2] four counts of attempted murder (§§ 664/187, Counts Two, Three, Four, and Five), and one count of shooting at an inhabited dwelling (§ 246, Count Six). Jesse was also convicted of one count of driving in willful or wanton disregard for safety while fleeing from a pursuing peace officer. (Veh. Code, § 2800.2, subd. (a), Count Seven.) With respect to the murder, the jury found the offense was committed by means of shooting a firearm from a motor vehicle at another person outside the vehicle with the intent to inflict great bodily injury. (§ 190, subd. (d).) The jury also found the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in any criminal conduct by gang members. (§ 186.22,

---

[1] Because Adam and Jesse Cornejo have the same last name, we refer to them by their first names; for consistency, we also refer to Isaac Vasquez by his first name.

[2] Undesignated statutory references are to the Penal Code.

subd. (b).)  Various firearm enhancement allegations were also found to be true.  (§§ 12022.53, subds. (c), (d), (e)(1), 12022.5, subd. (a).)  The trial court sentenced Adam and Isaac to serve an aggregate indeterminate prison term of 120 years to life plus a consecutive determinate term of 9 years 4 months.  Jesse was sentenced to serve the same indeterminate term of 120 years to life plus a consecutive determinate term of 10 years.

Defendants appeal.  The following contentions are made by each defendant: (1) the evidence was insufficient to establish the "criminal street gang" requirement of the gang enhancements because there is no evidence Sacramento Norteño subsets are part of the larger Norteño organization; (2) the trial court prejudicially erred and violated defendants' constitutional right of confrontation by admitting expert gang testimony concerning the basis for the expert's conclusions they were active Norteño gang members; (3) the trial court prejudicially erred by allowing expert testimony that defendants probably fired first because Ellison would not have wanted to attract trouble to his home; (4) the trial court prejudicially erred and violated defendants' constitutional right to due process by excluding evidence they claim indicated Ellison had returned to a gang lifestyle, which they argue was critical to their self-defense claim; (5) the trial court prejudicially erred and further violated defendants' constitutional rights by providing the jury with a different instruction on causation than that contained in bracketed portions of CALCRIM No. 520; and (6) their respective abstracts of judgment must be modified to reflect the victim restitution order is a joint and several obligation.  Adam and Isaac also assert:  (7) the trial court's imposition of a sentence that is the functional equivalent of life without parole (LWOP) amounts to cruel and unusual punishment.  Finally, Isaac contends:  (8) the trial court prejudicially erred and violated his constitutional rights by allowing one of the detectives in the case to convey a misleading portion of Isaac's statement to police; and (9) the cumulative effect of the foregoing assertions of error requires reversal.

Following oral argument, our Supreme Court decided *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*), which squarely addresses the first contention listed above. We requested supplemental briefing on the new case. Having reviewed this briefing, we conclude *Prunty* requires reversal of the gang enhancement findings (§ 186.22, subd. (b)) as to all defendants. Also, because each defendant was found to qualify for vicarious firearm enhancements under section 12022.53, subdivision (e)(1), which requires violation of section 186.22, subdivision (b), as an element of that enhancement, we must reverse these vicarious firearm enhancements as to all defendants as well.

We disagree with the remaining contentions raised by all defendants, except for the conceded point that their respective abstracts of judgment should reflect the victim restitution order is a joint and several obligation. Specifically, the challenged expert "basis" evidence did not violate defendants' constitutional right of confrontation. Nor did the trial court err by allowing expert testimony that defendants probably fired first because Ellison would not have wanted to attract trouble to his home. Defendants' contention that the trial court prejudicially erred and violated their constitutional right to due process by excluding evidence of Ellison's return to an active gang lifestyle is forfeited. Nor were their respective counsel ineffective for failing to preserve the issue for review. We also reject defendants' claim the trial court prejudicially erred and violated their constitutional rights by providing the jury with a different instruction on causation than that contained in a bracketed portion of CALCRIM No. 520. While the instruction provided was erroneous in two respects, the error was harmless.

Turning to the Eighth Amendment claim raised by Adam and Isaac, we concluded in our original opinion that remand for a new sentencing hearing was required because it was unclear whether the trial court properly considered all mitigating circumstances attendant in each juvenile offender's life, including but not limited to chronological age at the time of the crime and physical and mental development, before sentencing them to

serve the functional equivalent of life without parole (LWOP). In so concluding, we rejected the Attorney General's argument Senate Bill No. 260 (2013-2014 Reg. Sess.; codified as § 3051 of the Penal Code; Stats. 2013, ch. 312, § 4 (SB 260)), which became effective January 1, 2014, rendered resentencing unnecessary because, under newly-enacted section 3051, Adam and Isaac will be afforded a meaningful opportunity for parole "during [their] 25th year of incarceration" (§ 3051, subd. (b)(3)), i.e., within their natural life expectancies. We granted rehearing on this issue in light of certain language contained in *Montgomery v. Louisiana* (2016) 577 U.S. ___ [136 S.Ct. 718] (*Montgomery*), decided after our decision was issued. After receiving supplemental briefing on the issue, for reasons explained below, we now conclude *Montgomery* does not alter our analysis. Remand is still required.

Finally, the remaining claims brought by Isaac alone also fail. The trial court did not prejudicially err or violate his constitutional rights by allowing one of the detectives to convey a portion of his statement to police. Nor does the cumulative effect of the foregoing assertions of error require reversal.

Accordingly, with respect to Adam and Isaac, we reverse the gang enhancement and vicarious firearm enhancement findings, otherwise affirm their convictions and enhancement findings, and remand the matter to the trial court for resentencing; following the new sentencing hearing, their respective abstracts of judgment shall reflect that any victim restitution order imposed by the trial court is a joint and several obligation. With respect to Jesse, we reverse the gang enhancement and vicarious firearm enhancement findings, modify the judgment to strike these enhancements, and affirm the modified judgment. The trial court is directed to amend Jesse's abstract of judgment to reflect the modifications and to indicate the victim restitution order already imposed is a joint and several obligation.

FACTS

On the afternoon of January 19, 2011, Ellison left his home to go to the store.  He drove his wife's Ford Taurus and brought along three other men, including Neal, who sat in the back of the car directly behind Ellison.  On the way to the store, Ellison picked up another man, who was walking to Ellison's house, and then continued on to the store.  Ellison, a former gang member, had a .40-caliber handgun in the car's center console.  According to his wife, he bought the gun for protection.  Having recently testified against another gang member in exchange for being released from jail, Ellison had received threats and was concerned about retaliation for being a "snitch."  Neal was aware of the threats.  He was also aware Ellison had a gun in the center console.

When Ellison and his companions returned from the store, they turned onto Ellison's street and noticed two vehicles approaching from the opposite direction.  The first vehicle was a small car.  The second vehicle was a Ford Explorer containing the defendants in this case.  In order to pull into his driveway, which was on the left side of the street, Ellison turned between the two vehicles.  Around this time, Neal noticed the occupants of the Explorer were giving them "hard looks" and said:  "[W]ho is them muggin' us?"  Before Ellison was able to put the car in park, Neal opened his door and started to step out to "figure out who was in them cars."  As he did so, the Explorer stopped in front of Ellison's house and the front and backseat passengers, Adam and Isaac, opened fire with semi-automatic handguns.

Neal managed to "jump back in the car" before the first shots were fired.  Multiple bullets struck the Taurus, shattering the rear window.  When someone in the car said, "shoot back," Neal grabbed Ellison's handgun from the center console, fired one round through the "busted out" back window, and then got out of the car and continued firing at the Explorer until he "couldn't shoot no more."  Neal fired at least six rounds.  However, it does not appear any of Neal's shots struck the Explorer.  Shots fired by Adam and Isaac

6

were far more accurate. Combined, they fired at least 14 rounds, hitting both the Taurus and Ellison's home multiple times. One bullet struck Ellison in the upper back as he leaned forward in the driver's seat, traveled through his neck and head, and lodged in his brain. Death from this gunshot wound came within a matter of minutes.

After Adam and Isaac finished firing upon Ellison and his companions, the Explorer drove away. The Taurus's remaining passengers got out of the car. Neal "took off running" with Ellison's gun because he was afraid of being arrested for being a felon in possession of a firearm. Ellison's wife, Jettiemarie Boyd, who witnessed the shooting from outside her neighbor's home, ran to her husband. During the shooting, the Taurus had continued forward into the garage door. The tires were still spinning when Boyd reached the car. She put the car in park, removed the keys from the ignition, and tended to her husband. Boyd's mother and various neighbors also came out to check on Ellison, who was "slumped over the steering wheel" with "blood . . . coming out of his neck, running down his chest." He died before law enforcement and medical personnel arrived on the scene.

A description of the Explorer and the shooters was given to police at the scene and relayed over the radio to nearby patrol cars. The vehicle was located a short time later, not far from the crime scene. When a traffic stop was initiated, Jesse led officers on a high-speed chase, reaching speeds of 85 miles per hour, before crashing the Explorer in an intersection. Defendants then attempted to flee on foot; each was taken into custody. During the chase, two handguns were thrown from the Explorer. Police recovered a 10-millimeter handgun along the chase route. Eight 10-millimeter casings found at the scene appeared to have been fired by this gun. A magazine for a 9-millimeter handgun and several unfired 9-millimeter rounds were also recovered along the chase route. The gun associated with the magazine and bullets was not recovered. However, Isaac admitted to police that a 9-millimeter handgun was also thrown from the vehicle and two 9-

millimeter casings found in the Explorer appeared to have been fired by the same gun that fired six such casings found at the scene of the crime. Gunshot residue tests also corroborated the fact that Adam and Isaac were the shooters, while Jesse drove the Explorer.

Finally, the prosecution provided testimony from an expert on criminal street gangs, Detective John Sample, who testified Jesse, Adam, and Isaac were each active members of the Norteño street gang, and a hypothetical shooting based on the facts of this case would have been committed in association with or for the benefit of the gang. We provide a more detailed description of Detective Sample's testimony in the discussion that follows.

## DISCUSSION

We first address those contentions asserted by all three defendants. Then, we address one claim raised by both Adam and Isaac. Finally, we address Isaac's remaining contentions.

## ALL DEFENDANTS

### I

### *Sufficiency of the Gang Evidence*

Defendants contend the evidence was insufficient to support the jury's finding they committed the charged offenses "for the benefit of, at the direction of, or in association with any criminal street gang" (§ 186.22, subd. (b)) because the required predicate offenses the gang expert testified about were committed by members of Norteño subsets that were different than the subsets to which defendants belonged and there was no substantial evidence linking these subsets to each other or to the greater Norteño gang. We agree.

Section 186.22, subdivision (b), increases punishment for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association

8

with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."

"To establish that a group is a criminal street gang within the meaning of the statute, the People must prove: (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity. [Citations.]" (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1457; § 186.22, subd. (f) (Section 186.22(f)).) "A 'pattern of criminal gang activity' is defined as gang members' individual or collective 'commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more' enumerated 'predicate offenses' during a statutorily defined time period. [Citations.] The predicate offenses must have been committed on separate occasions, or by two or more persons. [Citations.]" (*Duran*, *supra*, 97 Cal.App.4th at p. 1457; § 186.22, subd. (e); *People v. Loeun* (1997) 17 Cal.4th 1, 9-10.)

To satisfy these "criminal street gang" requirements, Detective Sample testified there were about 1,500 Norteño gang members in the Sacramento area. He had personally contacted about 150 such gang members. The detective testified their commonly used symbols are "the letter N, anything that is representative of the number 14 -- N is the 14th letter of the alphabet -- the Roman numerals XIV, which is the number 14 in Roman numerals, a one dot and a four dot. Typically their primary color is red. They use the Huelga bird as one of their primary symbols, which was taken from the United Farmworkers." He further testified their primary activities include "[a]ssaults with firearms, stabbings, homicides, narcotics trafficking, burglaries, robberies, stealing cars." Finally, the detective testified regarding the facts of two predicate offenses committed by gang members belonging to two different Norteño subsets. The first

9

predicate offense involved three Norteño gang members who belonged to the Varrio Centro subset, a "click that's in downtown Sacramento," one of whom fired upon a car being driven by a person he "had problems with in the past" while another threw two beer bottles at the car. The other predicate offense involved four Norteño gang members who belonged to the Varrio Gardenland subset, one of whom pulled out a handgun during a fight with a rival group of Norteños and shot three people, killing one. However, while there is more than sufficient evidence establishing the defendants in this case are Norteño gang members, they did not belong to the specific subsets whose members perpetrated the predicate offenses. Instead, Adam and Jesse belonged to the Oak Park subset, while Isaac belonged to the Varrio Franklin Boulevard subset. Detective Sample testified Norteño subsets adhere to the same structure, have the same beliefs, and claim membership in the overarching Norteño gang.

We are compelled by our Supreme Court's recent decision in *Prunty*, *supra*, 62 Cal.4th 59, to conclude the foregoing evidence was not sufficient to support the gang enhancements. There, as here, the prosecution's gang expert testified to two predicate offenses committed by members of two Norteño subsets, neither of which was the same subset to which the defendant belonged.[3] The only evidence indicating these subsets "identified with a larger Norteño group" was the expert's testimony that they all "referred to themselves as Norteños." (*Id.* at p. 69.) This, the court held, was not enough to show the Norteño gang the defendant sought to benefit by committing his crimes was the same Norteño gang that committed the predicate offenses. (*Id.* at pp. 75-76, 81-82.) Instead, the prosecution was required to prove "some associational or organizational connection uniting those subsets." (*Id.* at p. 71.) The court continued: "That connection may take

---

[3] Detective Sample was also the expert in *Prunty*. He testified about the same two predicate offenses there as he did in this case. (*Prunty*, *supra*, 62 Cal.4th at p. 69.)

10

the form of evidence of collaboration or organization, or the sharing of material information among the subsets of a larger group. Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together. And in other cases, the prosecution may show that various subset members exhibit behavior showing their self-identification with a larger group, thereby allowing those subsets to be treated as a single organization. [¶] Whatever theory the prosecution chooses to demonstrate that a relationship exists, the evidence must show that it is the same 'group' that meets the definition of section 186.22(f)—i.e., that the group committed the predicate offenses and engaged in criminal primary activities—and that the defendant sought to benefit under section 186.22[, subdivision] (b)." (*Id*. at pp. 71-72, fns. omitted.)

Here, as in *Prunty*, the evidence falls short of establishing an associational or organizational connection between the Norteño subsets who committed the predicate offenses, i.e., the Varrio Centro Norteños and the Varrio Gardenland Norteños, and the Norteño subsets to which defendants belonged, i.e., the Oak Park Norteños and the Varrio Franklin Boulevard Norteños. As in *Prunty*, Detective Sample "did not describe any evidence tending to show collaboration, association, direct contact, or any other sort of relationship among any of the subsets he described. None of his testimony indicated that any of the alleged subsets had shared information, defended the same turf, had members commonly present in the same vicinity, or otherwise behaved in a manner that permitted the inference of an associational or organizational connection among the subsets." (*Prunty*, *supra*, 62 Cal.4th at p. 82.)

With respect to showing a connection between the various subsets and the larger Norteño gang, the question becomes closer. As the Attorney General points out, Detective Sample testified Norteño subsets adhere to the same structure, have the same beliefs, and claim membership in the larger Norteño gang. However, the detective did

11

not testify as to what that purported structure was, or that it was somehow imposed upon the subsets by the larger Norteño organization. (See, e.g., *Prunty*, *supra*, 62 Cal.4th at p. 77 ["straightforward cases might involve subsets connected through formal ways, such as shared bylaws or organizational arrangements"; "proof that different Norteño subsets are governed by the same 'bylaws' may suggest that they function—however informally—within a single hierarchical gang"].) Nor is the fact subsets share the same beliefs sufficient to establish the associational connection required by *Prunty*. Instead, as our Supreme Court explained, "subsets of a criminal street gang must be united by their *activities*, not simply by their viewpoints." (*Id*. at p. 75, italics added.)

Finally, Detective Sample's testimony that Norteño subsets claim membership in the larger Norteño gang does not suffice to establish the requisite connection. As our Supreme Court explained: "[T]here are some limits on the boundaries of an identity-based theory. The evidence must demonstrate that an organizational or associational connection exists in fact, not merely that a local subset has represented itself as an affiliate of what the prosecution asserts is a larger organization. [Citation.] Although evidence of self-identification with the larger organization may be relevant, the central question remains whether the groups in fact constitute the same 'criminal street gang.' In making the required showing, moreover, the prosecution must do more than simply present evidence that various alleged gang subsets are found within the same broad geographic area. For instance, that the various alleged gang subsets in this case were located 'all over Sacramento' does not show that the subsets constituted a single criminal street gang. The prosecution must introduce evidence of the alleged subsets' *activities*, showing a shared identity that warrants treating them as a single group. Such evidence could come in the form of proof that a certain Norteño subset retaliates against a Sureño gang for affronts that gang has committed against other Norteño subsets. Behavior of this kind could suggest that members of the Norteño subset consider themselves to be

12

part of a larger association.  Or, the prosecution could introduce evidence showing that different subsets require their members to perform the same initiation activities. Evidence of this common behavior may be some evidence that members identify themselves as belonging to the same gang.  The key is for the prosecution to present evidence supporting a fact finder's reasonable conclusion that multiple subsets are *acting* as a single 'organization, association, or group.'  (§ 186.22(f).)  Evidence of self-identification must refer to the particular *activities* of subsets, and must permit the jury to reasonably conclude that the various subsets are associated with each other because of their shared connection with a certain group.  And where, as in this case, the alleged perpetrators of the predicate crimes under section 186.22(f) are members of particular subsets, the *behavior* of those subsets' members must connect them to the gang the defendant sought to benefit."  (*Prunty*, *supra*, 62 Cal.4th at pp. 79-80, italics added.) Thus, what is required is proof "various subset members exhibit *behavior* showing their self-identification with a larger group, thereby allowing those subsets to be treated as a single organization."  (*Id*. at p. 71, italics added.)

Here, as in *Prunty*, while there was ample evidence defendants self-identified as part of the larger Norteño gang and the Oak Park Norteños (Adam and Jesse's subset) collaborated with the Varrio Franklin Boulevard Norteños (Isaac's subset) to carry out the present offenses, Detective Sample "offered no evidence that . . . members [of the subsets who committed the predicate offenses] behaved in a manner that conveyed their identification with the larger association that [defendants] sought to benefit.  Instead, Sample simply described the subsets by name, characterized them as Norteños, and testified as to the alleged predicate offenses.  He offered no additional information *about their behavior* or practices that could reasonably lead the jury to conclude they shared an identity with a larger group.  The jury was consequently left with no way to connect the subsets that committed the predicate offenses to the larger Norteño group the prosecution

13

claimed [defendants] acted to benefit." (*Prunty*, *supra*, 62 Cal.4th at pp. 82-83, italics added, fn. omitted.)

We must therefore reverse the gang enhancement findings as to all defendants. Moreover, because each defendant was also found to qualify for vicarious firearm enhancements under section 12022.53, subdivision (e)(1), which requires violation of section 186.22, subdivision (b), as an element of that enhancement, we must also reverse these vicarious firearm enhancement findings as to all defendants. We note, however, Adam and Isaac were also found to have personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)) during the commission of their crimes, independently qualifying them for the 25-years-to-life enhancement for each crime.

## II

### *Admission of Gang Expert's "Basis" Testimony*

Defendants also contend the trial court violated their right of confrontation under the Sixth Amendment to the United States Constitution by allowing the prosecution's gang expert, Detective Sample, to testify concerning the basis for his conclusion defendants were active gang members. We disagree.

### A.

### *Additional Background*

Isaac moved in limine to preclude Detective Sample from testifying concerning certain unspecified out-of-court statements made by "various individuals identifying Isaac as a gang member" and other "'gang-related' reports," from which the detective concluded Isaac was an active gang member. Relying on the dissenting and concurring opinions in *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221, 183 L.Ed.2d 89] (*Williams*), Isaac argued this "basis" evidence "constitutes 'testimonial' hearsay, offered

14

for its truth," in violation of the Sixth Amendment.  Neither Adam nor Jesse joined in this argument in the trial court.

The trial court overruled Isaac's constitutional objection to this basis evidence, noting defense counsel would be able to cross-examine the detective concerning the basis for his opinion and argue to the jury the detective's opinion was not adequately supported.

During trial, Detective Sample testified he believed all three defendants were active Norteño gang members.  Sample based his opinion as to Adam on "numerous police reports" and "other documents" indicating Adam had been "in the company of gang members . . . on four separate occasions," had been "involved in gang-related crimes on two separate occasions," and had been involved in other "gang activity" on "two separate occasions."  Additionally, Adam indicated on his jail classification form that he was affiliated with the Norteños and requested separation from rival Sureño gang members.  With respect to Jesse, the detective testified:  "He admitted to being an Oak Park Norteño to Detective Al Sanchez.  He's been contacted in the company of known Norteño gang members, I believe, on six different occasions.  He's been involved in gang crimes on several occasions.  And he, too, filled -- described on his jail classification form that he was an associate to the Norteños and requested to be separated from Southerners, again, a term for the Norteño rivals."  Finally, with respect to Isaac, the detective testified:  "Multiple -- he's met multiple criteria.  I think I read almost a dozen reports containing gang evidence.  He was contacted on nine different occasions in the company of . . . known Norteño gang members.  He's been named by no less than two other Norteño gang members as a Norteño gang member.  He's been documented [as] involved in several gang crimes, several reports of documented gang graffiti found in his possession.  I've seen gang photos where Isaac is throwing up gang hand signs, and he's been involved in gang activity.  Additionally [on] his jail classification form he classified

15

himself as an XIV associate, again XIV being the Roman numeral 14, which is a common symbol for Norteños."

## B.

### *Analysis*

As a preliminary matter, neither Adam nor Jesse joined in Isaac's motion to exclude the foregoing basis testimony. And as we have previously explained, failure to join in a motion of a co-defendant generally forfeits the issue on appeal. (See *People v. Wilson* (2008) 44 Cal.4th 758, 793.) However, a litigant need not object if doing so would be futile. (*Ibid*.) Here, Detective Sample relied on the same types of information to form the basis of his conclusion that Adam and Jesse were active gang members as he did to form the basis of his identical conclusion with respect to Isaac. Thus, the trial court's rejection of Isaac's motion would have indicated to both Adam and Jesse that making their own objections would have been futile. We therefore address the issue as to each defendant.

"California law permits a person with 'special knowledge, skill, experience, training, or education' in a particular field to qualify as an expert witness (Evid. Code, § 720) and to give testimony in the form of an opinion (*id*., § 801). Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (*Id*., subd. (a).) The subject matter of the culture and habits of criminal street gangs . . . meets this criterion." (*People v. Gardeley* (1996) 14 Cal.4th 605, 617 (*Gardeley*).) California law also "permits gang experts to rely on reliable hearsay evidence to form an opinion, even if the evidence would otherwise be inadmissible. [Citations.] Sources can include written material and conversations with gang members and other officers. [Citations.]" (*People v. Valadez* (2013) 220 Cal.App.4th 16, 28-29 (*Valadez*); Evid. Code, § 801, subd. (b).) However, while the

16

expert may rely on such hearsay, and provide that information to the jury, "on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into 'independent proof' of any fact." (*Gardeley*, *supra*, 14 Cal.4th at p. 619.) Thus, as a matter of California law, "such 'basis' evidence is not offered for its truth, but only to reveal the basis for the expert opinions." (*Valadez*, *supra*, 220 Cal.App.4th at p. 30; *People v. Miller* (2014) 231 Cal.App.4th 1301, 1310 ["trial courts have long instructed juries that out-of-court statements related by experts as basis evidence may not be considered for the truth of the matter stated but only for the purpose of evaluating the expert's opinion"].)

Turning to the confrontation issue raised on appeal, in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177], the United States Supreme Court held the admission of testimonial statements of a witness not appearing at trial violates a defendant's confrontation rights unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. (*Id*. at pp. 53-54.) However, the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (*Id*. at p. 59, fn. 9.) Since *Crawford*, California courts have relied on *Gardeley* to conclude "out-of-court statements admitted as basis evidence [are] not admitted for their truth but only to help evaluate the expert's opinion, and for this reason the confrontation clause [does] not apply." (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1129 (*Hill*), citing *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209-1210 (*Thomas*); see also *Valadez*, *supra*, 220 Cal.App.4th at p. 30; *People v. Sisneros* (2009) 174 Cal.App.4th 142, 153-154; *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1426-1427; *People v. Cooper* (2007) 148 Cal.App.4th 731, 746-747.)

In *Hill*, *supra*, 191 Cal.App.4th 1104, our colleagues in the First Appellate District, Division Five, questioned the foregoing conclusion, noting it was based on the

"implied assumption that the out-of-court statements may help the jury evaluate the expert's opinion without regard to the truth of the statements. Otherwise, the conclusion that the statements should remain free from *Crawford* review because they are not admitted for their truth is nonsensical. But this assumption appears to be incorrect." (*Hill*, *supra*, at pp. 1129-1130.) Nevertheless, the court concluded it was bound by *Gardeley* and similar precedent from our Supreme Court and concluded the admission of several out-of-court statements as basis evidence, including a testimonial statement, violated neither the hearsay rule nor the confrontation clause because they were not offered for their truth but only to evaluate the expert's opinions. (*Hill, supra,* at pp. 1129-1130.)

Like other California courts, we are bound by our Supreme Court's conclusion in *Gardeley, supra,* 14 Cal.4th 605 that basis evidence is not admitted for its truth and reject defendant's confrontation claim on that basis. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Nevertheless, defendants urge: "Five Justices of the United States Supreme Court have soundly rejected the view that expert 'basis evidence' is not admitted for its truth." (See *Williams*, *supra*, 567 U.S. ___ [132 S.Ct. 2221, 183 L.Ed.2d 89].) "In *Williams*, the defendant challenged a laboratory expert's testimony that a DNA report from a prior kidnapping, rape, and robbery—which was not introduced into evidence—matched a DNA sample taken from the defendant upon his arrest on unrelated charges. In a [four-to-one-to-four] decision, the court held there was no confrontation clause violation, but a majority of justices could not agree on a rationale. Justice Alito, in a plurality opinion joined by the Chief Justice and two other justices, reasoned the report was not offered for its truth, but for the limited purpose of explaining the basis for the assumptions underlying the expert's independent conclusion that the samples matched, and even if it was admitted into evidence for its truth, the report was not testimonial. (*Williams*, *supra*,

18

132 S.Ct. at p. 2228 (plur. opn. of Alito, J.).) The five other justices in two opinions (Justice Thomas, concurring in the judgment, and Justice Kagan, joined by three other justices, dissenting) all expressed the view that the report was offered for its truth, although Justice Thomas found it was not testimonial, while the dissenting justices found it was. (*Id.* at p. 2257 ['[S]tatements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose'], 2260 (conc. opn. of Thomas, J.); *id.* at pp. 2268, 2271 [the expert's description of the report 'was offered for its truth because that is all such "basis evidence" can be offered for'], 2273 (dis. opn. of Kagan, J.).)" (*Valadez, supra*, 220 Cal.App.4th at pp. 31–32, fn. omitted.)

Defendants also argue "a clear majority" of our Supreme Court reached a similar conclusion in *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*). "In *Dungo,* a forensic pathologist testified the victim in the case had been strangled, basing his opinion on facts contained in an autopsy report by another pathologist, which was not introduced into evidence. (*Dungo, supra,* 55 Cal.4th at pp. 618–619 . . . .) The majority opinion, written by Justice Kennard and joined by the Chief Justice and three other justices, concluded the statements in the autopsy report were not testimonial, and therefore not subject to the confrontation clause. (*Id.* at p. 621 . . . .) That opinion did not address the hearsay issue, although it noted the *Williams* plurality's nonhearsay rationale. ([*Dungo*] at p. 618 . . . .) Justice Werdegar wrote a concurring opinion, however, which garnered majority support (joined by the Chief Justice and two other justices), explaining the statements in the report were offered for their truth, so they were subject to the confrontation clause. ([55 Cal.4th] at p. 627 . . . (conc. opn. of Werdegar, J.).) In dissent, Justice Corrigan, joined by Justice Liu, noted, 'When an expert witness treats as factual the contents of an out-of-court statement, and relates as true the contents of that statement to the jury, a majority of the high court in *Williams* . . . rejects the premise that the out-of-court statement is not

19

admitted for its truth.' (*Id.* at p. 635 . . . (dis. opn. of Corrigan, J.).)" (*Valadez*, *supra*, 220 Cal.App.4th at p. 32.)

We disagree that either *Williams, supra,* 132 S.Ct. 2221 or *Dungo, supra,* 55 Cal.4th 608 authorizes us to disregard *Gardeley, supra,* 14 Cal.4th 605. Beginning with *Williams*, we note that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds. . . .' [Citation.]" (*Marks v. United States* (1977) 430 U.S. 188, 193 [51 L.Ed.2d 260, 266].) In *Williams*, five Justices agreed the extrajudicial basis of an expert's opinion is necessarily considered for its truth, but only one of those Justices (Thomas) concurred in the judgment; the other four Justices joined in the dissent. Moreover, it cannot be said those portions of the concurring and dissenting opinions were necessary to the result in that case, which was to affirm a judgment finding the testimony at issue did not violate the confrontation clause. To treat the opinions of four dissenters with one justice concurring in the judgment as precedent would lead to an absurd result because it would be precedent contrary to the result and judgment in the case. And while a majority of our Supreme Court has expressed agreement with the common view expressed in the concurring and dissenting opinions in *Williams*, we believe that had the court intended to overrule the long-standing rule that expert "basis" evidence is not offered for its truth, but only to reveal the basis for the expert opinions, it would have done so directly and explicitly, and not by implications expressed in a concurrence and a dissent.

We conclude the common view expressed in the concurring and dissenting opinions in *Williams, supra*, 132 S.Ct. 2221, that the extrajudicial basis of an expert's opinion is necessarily considered for its truth, may not be taken as a holding of the United States Supreme Court since it is not yet the basis of any judgment. (See *Dungo*, *supra*,

20

55 Cal.4th at pp. 627-629 (conc. opn. of Chin, J.).)  We also conclude the views expressed in the concurring and dissenting opinions in *Dungo* may not be taken as a holding overruling *Gardeley, supra,* 14 Cal.4th 605.  While these opinions may indeed signal how these courts will rule in a future case, they have no precedential value here. We remain bound by *Gardeley*.  (*Auto Equity Sales, Inc. v. Superior Court*, *supra*, 57 Cal.2d at p. 455.)

Because the challenged evidence was admitted for the limited purpose of explaining the basis of Detective Sample's opinions, its admission did not run afoul of defendants' right to confrontation under the Sixth Amendment.

## III

### *Admission of Certain Opinion Evidence*

Defendants further assert the trial court prejudicially erred by allowing expert opinion testimony that defendants probably fired first because Ellison would not have wanted to "attract trouble" to his home.  Not so.

### A.

### *Additional Background*

Detective Jason Kirtlan interviewed Neal in the presence of Neal's attorney, who had secured an immunity agreement for Neal prior to the interview.  During his cross-examination of Detective Kirtlan, Jesse's trial counsel asked:  "Now, when [Neal] came to talk to you, isn't it true that the first thing you said to him is, I know you're the victim?"  The detective answered:  "Something to that effect, yes."  Counsel then asked: "Wouldn't it have been better to wait until you had heard what he had to say before you accepted his innocence?"  The detective responded:  "As I discussed earlier, there was overwhelming evidence in this case, as I've outlined, as to why I felt he was the victim and fired back in self-defense, as shared with the D.A.'s office, who agreed, and in this case gave him a letter of immunity."

21

During the prosecution's redirect examination, the prosecutor asked Detective Kirtlan: "Is there anything other than what you've already stated, which is the placement of the casings and the evidence around the scene, the statements from [Boyd] and other witnesses and the overall ballistics evidence in the case, including the shot into [a neighboring] house, that causes you to take the position that, in fact, [Neal] was being truth[ful] -- that [Neal] did fire back second?" The detective answered: "Yes, there is." Then, after various objections were overruled, he explained: "[Ellison] was pulling into his driveway. He was in his neighborhood. He is not going to attract, nor would the occupants of his vehicle, in my belief, attract trouble to their home. [¶] The [Explorer] was out of the area. They're south area occupants up in the north area in a vehicle with weapons. [Ellison] was pulling into his driveway. [¶] If they were -- if [Neal] were to have shot, the vehicle gets away, now they know where to come back to retaliate. [¶] It doesn't make sense to me. And given the totality of the rest of the evidence, that led me to my determination that the Taurus was fired on." Isaac's trial counsel then objected that the answer was an "[i]mproper opinion," which was overruled.

During Detective Sample's expert testimony, the prosecutor asked: "Assume that you have a gang member with several other people in his car. This gang member is feeling vulnerable. He has got a gun in his car. He's been threatened, he's been labeled a snitch. And he comes down the street and he sees other people coming towards him who are muggin' him, they don't -- he doesn't know them, the people in his car don't know them, but they know that they are giving hard looks to him. [¶] Would it be consistent with your knowledge of gang members for those people feeling vulnerable to turn into a dead end and leave themselves open to attack?" Jesse's trial counsel objected that the answer was "speculative," which was overruled. The detective then answered: "No, it did not -- it would not seem a likely response for somebody who's that alert to a possible threat."

22

**B.**

*Analysis*

Defendants argue the testimony of both detectives amounted to improper expert opinion for three reasons: (1) "the subject matter was not beyond the common experience of the average juror"; (2) "the opinion was essentially a question of whether the experts thought that Neal and [Boyd] were telling the truth when they testified that the [defendants] fired first"; and (3) because "the whole case boiled down to whether the jury determined that Neal fired first or they fired first," the testimony amounted to "their view of how the case should be decided." In response, the Attorney General draws a distinction between the two witnesses. With respect to Detective Kirtlan, the Attorney General argues the challenged testimony "was not admitted as his opinion on whether Neal in fact acted in self defense," but rather "was properly admitted to rebut the implied bias raised by the defense under Evidence Code section 780, subdivision (f)," i.e., the detective concluded Neal fired in self-defense before speaking to him because of a prior working relationship with Ellison and Boyd because Ellison had cooperated in a previous case against a fellow gang member. With respect to Detective Sample, the Attorney General argues the challenged testimony was a proper expert opinion.

**1.    *Detective Kirtlan's Testimony was Properly Admitted***

"In determining the credibility of a witness, the jury may consider, among other things, '[t]he existence or nonexistence of a bias, interest, or other motive' for giving the testimony. (Evid. Code, § 780, subd. (f).)" (*People v. Price* (1991) 1 Cal.4th 324, 422.) "Evidence showing a witness's bias or prejudice or which goes to his [or her] credibility, veracity or motive may be elicited during cross-examination." (*People v. Howard* (1988) 44 Cal.3d 375, 428.) Here, Jesse's trial counsel properly sought to elicit such evidence during his cross-examination of Detective Kirtlan by asking whether he was "frequently in contact" with Ellison and Boyd during his investigation of the previous case in which

23

Ellison provided testimony against another gang member, which the detective admitted, and whether this working relationship made Detective Kirtlan "a little more emphatic" about "find[ing] the people that [he] believed were responsible," which the detective denied. Counsel then asked Detective Kirtlan about his interview with Neal, specifically, whether he accepted the fact Neal was an innocent victim before he even "heard what he had to say." The purpose for these questions, and the order in which they were asked, is unmistakable. Counsel was seeking to establish that the detective did not consider the possibility Neal could have started the gun fight by firing on the Explorer because of his bias in favor of Ellison, one of his "snitches."

In these circumstances, it was proper for the prosecution to then rehabilitate the detective by eliciting the reason he believed Neal did not fire first before he had spoken to the man. In other words, the challenged testimony was offered to show the detective's belief Neal fired in self-defense was based on reason, as opposed to mere bias, as the defense questioning suggested. (See, e.g., *People v. Nichols* (1970) 3 Cal.3d 150, 157 [prosecution properly offered evidence of the reasonable basis for witness's testimony to rebut inference of bias raised by the defense on cross-examination].)

### 2.      *Detective Sample's Testimony was Properly Admitted*

As previously explained, expert opinion testimony must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) "The subject matter of the culture and habits of criminal street gangs . . . meets this criterion." (*Gardeley*, *supra*, 14 Cal.4th at p. 617.) Here, Detective Sample testified, based on his special knowledge, training, education, and experience working as a gang detective, that a gang member who is feeling vulnerable because he has been threatened and labeled a snitch would not be likely to turn into a dead end and leave himself open to attack. Defendants argue this specific opinion was not sufficiently beyond common experience to be helpful to the jury

24

because "[n]o sensible person, regardless of their gang status, would knowingly place themselves in a trap if they thought the[y] were under threat." We disagree. While no sensible person would pull into his own driveway and start a gun fight with no means of escape, whether a *gang member* would do so is not something the average juror would know. Nor was Detective Sample's testimony simply an opinion as to whether Neal and Boyd had testified truthfully concerning how the gun fight occurred, or as to how the jury should ultimately decide the case.

The trial court did not abuse its discretion in allowing the challenged testimony of Detectives Kirtlan and Sample.

## IV

### *Exclusion of Defense Evidence*

Defendants claim the trial court prejudicially erred and violated their constitutional right to due process by excluding evidence of a post made to Ellison's Facebook page on the day of the shooting, which they argue indicated Ellison "had reentered gang life" and "was associating with gang members." According to defendants, this evidence was highly probative of their defense, i.e., Ellison was killed in self-defense after Neal opened fire on them, because "the people in Ellison's car had the same motivations to shoot first as the gang expert attributed to [defendants]." Defendants also claim the excluded evidence "would [have] support[ed] the defense contention that Ellison drove his car in a way to force [defendants] to stop in front of his house" and "would [have] rebut[ted] [Boyd's] testimony that Ellison only purchased the gun because he was afraid of being attacked because he was cooperating with the police."

### A.

### *Additional Background*

Jesse moved in limine to introduce a printout from Ellison's Facebook page that included a post made around two hours before the murder. The post stated: "GET

25

MONEY TRUST NOT A SOUL MONEY AND MURDER I SWEAR IM BACK AT IT AGAIN WHO CAN I TRUST IN THIS WORLD????????????????????? GET ACTIVE." The printout also included Ellison's profile picture, in which he was apparently making a gang sign with his hands.

Jesse's trial counsel argued the post was relevant to show Ellison's state of mind at the time of the shooting, i.e., he and the other occupants of the Taurus "were expecting to get hit" and "were expecting trouble," which he argued was "very probative of who fired first." Counsel also argued the post was admissible despite the hearsay rule because it qualified as a statement of Ellison's then-existing state of mind and a statement against penal interest. Counsel further argued Boyd, who also had access to Ellison's Facebook account, could authenticate the post. Isaac's attorney joined in these arguments.

In response, the prosecutor did not object to the profile picture being admitted, but argued defense counsel was attempting to "circumvent the hearsay rules and circumvent the foundational requirements" by seeking to admit the Facebook post. With respect to hearsay, the prosecutor did not actually make an argument. With respect to foundation, the prosecutor questioned whether counsel would be able to establish Ellison "did in fact, make that entry."

After further argument from defense counsel, the trial court took the matter under submission.

Trial began without a ruling on admissibility of the Facebook post. The following exchange occurred during Jesse's cross-examination of Neal:

"Q    Did you also say that [Ellison] don't even gang bang no more?

"A    Yes, I did say that. He did not gang bang anymore.

"Q    You don't know -- you say you know that for a fact?

"A    I know that for a fact. [¶] He got married and he was a family -- was a family man. He was changing his life. His grandma had just passed away. He had just

26

got saved.  [¶]  He was -- he was a totally different dude that I know from growin' up with.  I know for a fact he did not gang bang anymore.

"Q     Did you ever go on his Facebook page?

"A     Yes, I did.

"Q     When was the last time you went on his Facebook page?

"A     Um, I been on there after he was killed.  I been on there before he was killed."

At this point, counsel again sought to admit the Facebook post, arguing the post was admissible under Evidence Code section 780 as evidence tending to disprove the truthfulness of Neal's testimony that Ellison was no longer "gang banging."  The trial court ruled the post inadmissible under Evidence Code section 352, as requiring the jury to "embark on . . . something that's a bit of a side show, and that is the question of whether or not [Neal] believes [Ellison] was involved as a gang banger at the time."  The trial court then instructed the jury to disregard Neal's "opinions as to whether or not [Ellison] was or was not involved actively as a member of a gang."

## B.

### *Forfeiture*

We first note neither Jesse's trial counsel, nor counsel of either co-defendant, pressed for a ruling on the matter of whether or not the Facebook post was admissible as substantive evidence Neal fired first, prompting Adam and Isaac to return fire in self-defense.  (See *People v. Braxton* (2004) 34 Cal.4th 798, 813-814 [failure to press for a ruling generally forfeits contention of error].)  Indeed, Adam's trial counsel did not join in the argument in the first place.  (See *People v. Wilson, supra,* 44 Cal.4th at p. 793 [failure to join in the objection or motion of a codefendant generally forfeits the issue on appeal].)  When the matter of the Facebook post was revisited during Jesse's cross-examination of Neal, counsel sought to admit the evidence *to impeach Neal's testimony*

27

*that Ellison was no longer a gang member*, but did not indicate to the trial court he was also pressing for a ruling on whether the evidence was admissible to prove self-defense. Thus, the trial court ruled the Facebook post was not admissible *to impeach Neal* under an Evidence Code section 352 analysis. The trial court never ruled on the initial motion to admit this evidence *to prove self-defense*, nor did any of the defendants press the trial court to do so. By failing to press for a ruling—and in Adam's case, by failing to join in the argument altogether—defendants have forfeited their now-joint contention the trial court prejudicially erred and violated their due process rights by excluding the proffered evidence.

## C.

### *Ineffective Assistance of Counsel*

Anticipating forfeiture, Jesse argues his trial counsel rendered constitutionally deficient assistance by failing to "explicitly argue that the fact that Ellison had returned to an active gang life would tend to show that he and his associates . . . were just as likely to fire first as were Jesse and his associates." Adam and Isaac join in this argument as well, which we interpret as arguing their respective counsel were equally ineffective.

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.' [Citations.]" (*Ibid.*, quoting *United States v. DeCoster* (D.C.Cir. 1973) 487 F.2d 1197, 1202.) "'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.]

Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."'" (*In re Harris* (1993) 5 Cal.4th 813, 832-833; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.)

Defendants have not carried their burden. Even assuming (1) counsel would have been able to establish Ellison in fact made the post to his Facebook page, (2) the post indeed meant Ellison had decided to return to an active gang lifestyle, (3) defendants are correct that the Facebook post was relevant to establish (a) Neal was just as likely to have fired first as were Adam and Isaac, (b) Ellison likely drove the Taurus in between the first car and the Explorer in order to force defendants to stop in front of his house, and (c) contrary to Boyd's testimony, Ellison did not purchase the handgun solely because he was afraid of being attacked for having cooperated with the police, and (4) the post was not inadmissible hearsay because it evidenced Ellison's then-existing state of mind, we cannot conclude exclusion of this evidence would have been an abuse of discretion under Evidence Code section 352 or a violation of their constitutional right to due process.

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Our Supreme Court has explained this section "permits the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption," but "requires that the danger of these evils substantially

29

outweigh the probative value of the evidence." (*People v. Lavergne* (1971) 4 Cal.3d 735, 744; see also *People v. Holford* (2012) 203 Cal.App.4th 155, 168.) Rulings under this provision "come within the trial court's discretion and will not be overturned absent an abuse of that discretion." (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.)

Here, the Facebook post was minimally probative of defendants' claim of self-defense. Even assuming the post established in the jurors' minds that Ellison possessed the gun, not simply for protection, but also for gang purposes, i.e., confrontation, and Ellison deliberately cut off the Explorer while pulling into his driveway, neither fact would justify defendants' actions of opening fire on Ellison's car. The only purported fact that would justify such an assault is Neal's firing at the Explorer first, or at the very least, pointing Ellison's gun in defendants' direction, and thereby causing a reasonable belief in the need to employ deadly force in self-defense. But the Facebook post was made by *Ellison*, not *Neal*. There is no dispute Neal was the one who fired Ellison's gun. Indeed, Ellison was apparently hit before he could put the car in park. Ellison's post was therefore relevant on the issue of Neal's conduct only if Neal was aware of the post. In other words, Ellison's decision to return to gang life, by itself, does not tend to prove anything *about Neal*. However, Neal's belief Ellison was out of the gang life would tend to make it less likely that he would take it upon himself to use Ellison's gun to fire upon another vehicle in front of Ellison's house had occupants of that vehicle not fired first. Conversely, Neal's belief Ellison had returned to the gang life would tend to make his firing first in these circumstances more likely. But how much more likely? We conclude the answer is "not much." The evidence established Ellison had offered testimony against a rival gang member, had been threatened for having done so, and was pulling into his driveway when the shooting occurred. In these circumstances, regardless of whether Ellison had decided to return to the gang lifestyle, and regardless of whether Neal was aware of this decision, opening fire on an Explorer full of gang members *in*

*front of Ellison's house, and in a driveway with no means of escape* when the occupants of the Explorer predictably returned fire, is so unlikely as to be implausible.

Weighing against this low level of probative value is the reality that admission of the evidence would have required a significant consumption of time. The defense would have been required to establish what we have assumed in our analysis thus far, i.e., the post was in fact made by Ellison, the post indeed meant Ellison had returned to an active gang lifestyle, and Neal was aware of his return to this lifestyle. In light of the minimal probative value of the evidence, we cannot conclude the trial court would have abused its discretion by excluding the evidence under an Evidence Code section 352 analysis. Nor are we persuaded such a decision would have amounted to a deprivation of due process. While defendants are correct to point out Evidence Code section 352 "must bow to the due process right of a defendant to a fair trial and his [or her] right to present all relevant evidence of significant probative value to his [or her] defense[,] . . . the proffered evidence must have more than slight relevancy to the issues presented. [Citation.]" (*People v. Burrell–Hart* (1987) 192 Cal.App.3d 593, 599; *People v. Reeder* (1978) 82 Cal.App.3d 543, 553.) Here, as we have already explained, the Facebook post did not have significant probative value.

In sum, because admission of the Facebook post would have necessitated an undue consumption of time and the post was not significantly probative of defendants' claim of self-defense, the trial court would not have abused its discretion or violated defendants' due process rights by excluding the evidence under Evidence Code section 352 had defendants' respective counsel pressed for a ruling on the matter. Thus, regardless of whether reasonable counsel would have pressed for such a ruling, our confidence in the outcome is not undermined.

31

# V

### *Causation Instruction*

Defendants also contend the trial court prejudicially erred and violated their constitutional rights by providing the jury with a different instruction on causation than that contained in bracketed portions of CALCRIM No. 520. We disagree.

CALCRIM No. 520 defines the crime of murder for the jury. The jury was so instructed.[4] Defendants complain the trial court did not provide the following bracketed portions of the instruction on the issue of causation: "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. [¶] There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A *substantial factor* is

---

[4] As given to the jury in this case, CALCRIM No. 520 provides: "The defendants are charged in Count One with murder. To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant committed an act that caused the death of another person. [¶] Two, when the defendant acted, he had a state of mind called malice aforethought. And, three, he killed without lawful justification. [¶] There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with express malice if he unlawfully intended to kill. A defendant acted with implied malice if, one, he intentionally committed an act. [¶] Two, the natural and probable consequences of that act are dangerous to human life. Three, at the time he acted, he knew his act was dangerous to human life, and, four, he deliberately acted with conscious disregard for human life. [¶] Malice aforethought does not require hatred or ill-will toward the victim. It is a mental state that must be formed before the act that causes death is committed. [¶] It does not require deliberation or the passage of any particular period of time."

32

more than a trivial or remote factor. However, it does not need to be the only factor that causes the death." (CALCRIM No. 520.)

Instead of the foregoing bracketed portions of CALCRIM No. 520, the trial court instructed the jury, in language virtually identical to CALJIC No. 3.41, as follows: "There may be more than one proximate cause of a homicide, even when there is only one known or actual or direct cause of death. [¶] When the conduct of two or more persons contributes concurrently as a proximate cause of the death, the conduct of each is a proximate cause of the death if that conduct was also the substantial factor contributing to the result. [¶] A cause is concurrent if it was operative at the time of death and acted with another cause to produce death."

Both CALCRIM No. 520 and CALJIC No. 3.41 indicate in their respective use notes that a trial court has a sua sponte duty to instruct on proximate cause if causation is an issue in the case. (Use Notes to CALCRIM No. 520 and CALJIC No. 3.41.) CALCRIM No. 520's use note continues: "If the evidence indicates that there was only one cause of death, the court should give the 'direct, natural, and probable' language in the first bracketed paragraph on causation. If there is evidence of multiple causes of death, the court should also give the 'substantial factor' instruction and definition in the second bracketed causation paragraph." (Use Note to CALCRIM No. 520.)

"The California Judicial Council withdrew its endorsement of the long-used CALJIC instructions and adopted the new CALCRIM instructions, effective January 1, 2006." (*People v. Thomas* (2007) 150 Cal.App.4th 461, 465.) California Rules of Court,[5] rule 2.1050(e) provides: "Use of the Judicial Council instructions is strongly encouraged. If the latest edition of the jury instructions approved by the Judicial Council contains an instruction applicable to a case and the trial judge determines that the jury

---

[5]     Undesignated rule references are to the California Rules of Court.

33

should be instructed on the subject, it is recommended that the judge use the Judicial Council instruction unless he or she finds that a different instruction would more accurately state the law and be understood by jurors." However, as our Supreme Court has explained, "a trial court's failure to give the *standard* . . . instruction does not necessarily constitute state law error," and while "use of the standard instruction . . . is preferred, it is not mandatory." (*People v. Aranda* (2012) 55 Cal.4th 342, 354.) Nor does the trial court's failure to use the standard instruction "amount to state law error when its substance is covered in other instructions given by the court." (*Ibid.*)

Here, the substance of the second bracketed causation paragraph of CALCRIM No. 520 was covered by the CALJIC instruction given to the jury. "CALJIC instructions that were legally correct and adequate on December 31, 2005, did not become invalid statements of the law on January 1, 2006. Nor did their wording become inadequate to inform the jury of the relevant legal principles or too confusing to be understood by jurors. The Judicial Council's adoption of the CALCRIM instructions simply meant they are now endorsed and viewed as superior. No statute, Rule of Court, or case mandates the use of CALCRIM instructions to the exclusion of other valid instructions." (*People v. Thomas*, *supra*, 150 Cal.App.4th at pp. 465-466.)

However, we do agree with defendants on two points. First, the instruction given to the jury in this case, CALJIC No. 3.41, omits "the basic legal definition of cause." This is because that definition was provided in CALJIC No. 3.40, which was not given to the jury.[6] Second, the instruction given to the jury used the term "proximate cause,"

---

[6] This instruction states in relevant part: "The criminal law has its own particular way of defining cause. A cause of the (result of the crime) is an [act] [or] [omission] that sets in motion a chain of events that produces as a direct, natural and probable consequence of the [act] [or] [omission] the (result of the crime) and without which the (result of the crime) would not occur." (CALJIC No. 3.40.)

which does not appear in either the current CALCRIM instruction or the post-1992 CALJIC version of the instruction. This is because our Supreme Court has held use of the term "proximate cause" in such an instruction "may mislead jurors, causing them . . . to focus improperly on the cause that is spatially or temporally closest to the harm." (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1052; *People v. Roberts* (1992) 2 Cal.4th 271, 313.) However, as we explain immediately below, the error was harmless under any standard.

In this case, as in *People v. Sanchez* (2001) 26 Cal.4th 834, "it is proximate causation, not direct or actual causation, which, together with the requisite culpable mens rea (malice), determines [defendants'] liability for murder." (*Id.* at p. 845.) Here, there was no dispute Ellison died of a single gunshot wound. This was the direct, but-for cause of death. Overwhelming evidence established both Adam and Isaac fired into Ellison's car. Who fired the fatal shot is irrelevant. As our Supreme Court explained: "A person can proximately cause a gunshot injury without personally firing the weapon that discharged the harm-inflicting bullet. For example, in *People v. Sanchez*, *supra*, 26 Cal.4th 834, . . . two persons engaged in a gun battle, killing an innocent bystander. Who fired the fatal bullet, and thus who personally inflicted the harm, was unknown, but we held that the jury could find that *both* gunmen proximately caused the death. (*Id.* at pp. 848–849 . . . .)" (*People v. Bland* (2002) 28 Cal.4th 313, 337.) The same is true here. While the jury should have been instructed with the "direct, natural, and probable consequences" language, we have no doubt the jury reached the same conclusion without it, i.e., the act of firing the fatal shot caused Ellison's death. Then, under the instruction that was provided, the jury properly concluded both Adam and Isaac proximately caused the death regardless of who fired the fatal shot. Moreover, use of the term "proximate cause" in the instruction, while improper, could only have benefitted defendants by potentially misleading jurors that proximate cause has a "'physical or temporal

35

nearness'" requirement that does not exist in the law. (*People v. Bland*, *supra*, 28 Cal.4th at p. 338.) As for Jesse, liability for murder turned on principles of aiding and abetting, on which the jury was appropriately instructed. Thus, any instructional error was manifestly harmless.

Nevertheless, defendants argue there is evidence the occupants of the smaller car in front of the Explorer may have also fired upon Ellison's car, and one of them might have fired the fatal shot. While there is some evidence shots may have also been fired from the smaller car, this would not undermine our conclusion Adam and Isaac, by firing their own bullets into Ellison's car, also proximately caused Ellison's death. Stated simply, assuming there were three gunmen instead of two, who fired the fatal bullet is still unknown, and the jury could find *all three* gunmen proximately caused the death. Nor are we persuaded by the argument, made in Adam's opening brief, it would be speculative to conclude that "defendants were acting in concert with the occupants of the other vehicle, or that the occupants of the two vehicles even knew each other." If, as defendants suggest, both the Explorer and the smaller lead car fired upon Ellison's car as it pulled into the driveway, a reasonable inference is that the two vehicles were acting in concert. Adam's trial counsel acknowledged as much when he argued in closing that the smaller car was "a companion car" containing "friends of theirs." Moreover, defendants cite no authority for the proposition that the two cars had to act in concert in order for Adam and Isaac to have proximately caused Ellison's death by also firing upon his car. Indeed, in *People v. Sanchez*, *supra*, 26 Cal.4th 834, the two gunmen who were found to have proximately caused the death of the innocent bystander were not acting in concert, but rather in opposition to each other. (*Id*. at pp. 840-841.)

We conclude that while the trial court erred by instructing the jury with an out-of-date version of CALJIC No. 3.41, rather than the preferred bracketed portions of

CALCRIM No. 520 on causation, the error was manifestly harmless under any standard of prejudice.

## VI

### *Modification of the Abstract of Judgment*

The final claim asserted by all defendants is that their respective abstracts of judgment must be modified to reflect the victim restitution order is a joint and several obligation. The Attorney General concedes the point. We accept the concession. (See *People v. Leon* (2004) 124 Cal.App.4th 620, 622 [trial court may impose liability on each defendant to pay the full amount of the economic loss as long as the victim does not obtain a double recovery]; *People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1535 [to avoid double recovery, the court has authority to order victim restitution paid jointly and severally].) With respect to Jesse, we order the trial court to amend his abstract of judgment to reflect the victim restitution order is a joint and several obligation. However, as we explain immediately below, the judgments entered against Adam and Isaac must be reversed and their matters remanded to the trial court for a new sentencing hearing. Accordingly, there is no need to order the trial court to amend their current abstracts of judgment. Following this new sentencing hearing, their respective abstracts of judgment shall also reflect any victim restitution order imposed by the trial court is a joint and several obligation.

## ADAM AND ISAAC

## VII

### *Cruel and Unusual Punishment*

Adam and Isaac also assert the trial court's imposition of a sentence the functional equivalent of LWOP amounts to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. As previously mentioned, after issuing an opinion agreeing with this contention and remanding the matter for a new sentencing

37

hearing, we granted rehearing in light of the United States Supreme Court's decision in *Montgomery*, *supra*, 136 S.Ct. 718. After receiving supplemental briefing, we still conclude remand is required.

## A.

### *Additional Background*

Adam and Isaac were 17 and 16 years old, respectively, when they opened fire on Ellison and his companions, killing Ellison. Isaac was also developmentally disabled. Isaac's sentencing memorandum argued the probation department's recommendation that the trial court impose an indeterminate term of 170 years to life, plus a consecutive determinate term of 37 years 4 months, "on a mentally impaired minor with a severely disadvantaged upbringing, including a drug-addicted mother, absent father figure, periods of homelessness, and an abusive and chaotic family life" would violate the Eighth Amendment. Adam's sentencing memorandum similarly argued the probation department's recommendation that the trial court impose such a sentence "on a boy of only 17 years of age at the time of the offense, constitutes cruel and unusual punishment in violation of the Eighth Amendment."

The trial court sentenced Adam and Isaac each to serve an aggregate indeterminate prison term of 120 years to life plus a consecutive determinate term of 9 years 4 months. This sentence was comprised of the following: 20 years to life for second-degree murder by means of shooting a firearm from a motor vehicle with intent to inflict great bodily injury (§§ 187, 190, subd. (d)), plus 25 years to life for the greatest firearm enhancement attached to that crime (i.e., personally and intentionally discharging a firearm causing great bodily injury or death (§ 12022.53, subd. (d)), plus a consecutive determinate term of 9 years 4 months (4 consecutive terms of 2 years 4 months (one-third the middle term of 7 years)) for the attempted murders (§§ 187, 664, subd. (a)), plus *3* additional terms of 25 years to life for the same firearm enhancement attached to *3* of the attempted murders.

38

The trial court ran *one* of these 25-years-to-life firearm enhancements concurrently "in light of the constitutional scheme argued by defense."

## B.

### *Miller Violation*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments" and "contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'" (*Ewing v. California* (2003) 538 U.S. 11, 20 [123 S.Ct. 1179, 155 L.Ed.2d 108] quoting *Harmelin v. Michigan* (1991) 501 U.S. 957, 996-997 [111 S.Ct. 2680, 115 L.Ed.2d 836].) This constitutional right "'flows from the basic "precept of justice that punishment for crime should be graduated and proportioned"' to both the offender and the offense." (*Miller v. Alabama* (2012) 567 U.S. ___, ___ [132 S.Ct. 2455, 2458, 183 L.Ed.2d 407] (*Miller*), quoting *Roper v. Simmons* (2005) 543 U.S. 551, 560 [125 S.Ct. 1183, 161 L.Ed.2d 1] (*Roper*).)

In *Graham v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2011, 176 L.Ed.2d 825] (*Graham*), the United States Supreme Court held the Eighth Amendment "prohibits a State from imposing a life without parole sentence on a juvenile nonhomicide offender." (*Id*. at p. 75.) The court explained: "As compared to adults, juveniles have a '"lack of maturity and an underdeveloped sense of responsibility,"' they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.' [Citation.] These salient characteristics mean that '[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citation.] Accordingly, 'juvenile offenders cannot with reliability be classified among the worst offenders.' [Citation.] A juvenile is not absolved of responsibility for his [or her] actions, but his [or her] transgression 'is not as morally reprehensible as that of an adult.' [Citation.]" (*Id*. at

39

p. 68.)  The court also explained that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers," and therefore, "when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability.  The age of the offender and the nature of the crime each bear on the analysis."  (*Id*. at p. 69.)

Turning to the severity of an LWOP sentence, the court explained such a sentence "deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency—the remote possibility of which does not mitigate the harshness of the sentence," and noted this is "an especially harsh punishment for a juvenile," who "will on average serve more years and a greater percentage of his [or her] life in prison than an adult offender."  (*Graham*, *supra*, 560 U.S. at pp. 69-70.)  Finally, the court explored the penological justifications for such a sentence and concluded them to be "not adequate to justify life without parole for juvenile nonhomicide offenders." (*Id*. at p. 74.)  However, the court was also careful to point out the Eighth Amendment "does not require the State to release that offender during his [or her] natural life," explaining:  "Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives.  The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life.  It does forbid States from making the judgment at the outset that those offenders never will be fit to reenter society."  (*Id*. at p. 75.)

In *Miller*, *supra*, 567 U.S. ___ [132 S.Ct. 2455, 183 L.Ed.2d 407], the United States Supreme Court held the Eighth Amendment forbids a state from *mandating* the imposition of an LWOP sentence on a juvenile homicide offender.  (*Id*. at p. 2469.)  The court explained:  "Mandatory life without parole for a juvenile precludes consideration of

40

his [or her] chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him [or her]—and from which he [or she] cannot usually extricate himself [or herself]—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his [or her] participation in the conduct and the way familial and peer pressures may have affected him [or her]. Indeed, it ignores that he [or she] might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his [or her] inability to deal with police officers or prosecutors (including on a plea agreement) or his [or her] incapacity to assist his [or her] own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Id*. at p. 2468.) The court concluded: "Although we do not foreclose a sentencer's ability to [impose an LWOP sentence on a juvenile] in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Id*. at p. 2469.)

Consistent with these decisions, in *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), our Supreme Court held "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy," i.e., the "functional equivalent" of an LWOP sentence, "constitutes cruel and unusual punishment in violation of the Eighth Amendment. Although proper authorities may later determine that youths should remain incarcerated for their natural lives, the state may not deprive them at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future. . . . [T]he sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her

41

chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board. The Board of Parole Hearings will then determine whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.'" (*Id*. at pp. 268-269, quoting *Graham*, *supra*, 560 U.S. at p. 75.)

There can be no doubt the sentences imposed in this case, i.e., 120 years to life plus 9 years 4 months, are the functional equivalent of LWOP.[7] (See *Caballero*, *supra*, 55 Cal.4th at p. 268 [sentence of 110 years to life amounted to functional equivalent of LWOP].) This being a murder case, *Graham*'s categorical ban on imposition of an LWOP sentence on a juvenile nonhomicide offender does not apply. (*Graham, supra,* 560 U.S. 48.) However, under *Miller*, the trial court was still required to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller*, *supra*, 132 S.Ct at p. 2469.) This required the trial court to consider "all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development . . . ." (*Caballero*, *supra*, 55

_____

[7] Our dissenting colleague disputes such a term can be considered the functional equivalent of LWOP following the Legislature's passage of SB 260 because now youthful offenders are given an opportunity for parole at least by their 25th year of incarceration. However, as we explain in greater detail below, unless SB 260 can be said to *presently* convert the term actually imposed to one of 25 years to life, Adam and Isaac are serving sentences that are the functional equivalent of LWOP, notwithstanding SB 260's statutory *promise* of a parole hearing in 25 years. But the statutory language cannot be read so broadly. It does not *presently* convert these terms to that of 25 years to life.

Cal.4th at pp. 268-269.) The question we must resolve is whether the trial court took these circumstances into consideration before imposing such a harsh penalty.

We first note the trial court had no discretion but to impose a term of 20 years to life for the murder and a consecutive term of 25 years to life for the firearm enhancement. (See §§ 190, subd. (d), 12022.53, subd. (d).) Thus, the trial court was required to impose a term of 45 years to life on Count One (§ 187). However, whether to impose consecutive rather than concurrent sentences with respect to the remaining counts was a discretionary decision. (See § 669; *People v. Shaw* (2004) 122 Cal.App.4th 453, 458 [trial court has "broad discretion to impose consecutive sentences when a person is convicted of two or more crimes"].) "The trial court must 'state the reasons for its sentence choices on the record at the time of sentencing.' [Citation.] Where the court has discretion, the imposition of a consecutive, rather than concurrent, term represents a sentencing choice. [Citations.]" (*People v. Coelho* (2001) 89 Cal.App.4th 861, 886.) "Criteria affecting the decision to impose consecutive rather than concurrent sentences include: [¶] **(a) Criteria relating to crimes** [¶] Facts relating to the crimes, including whether or not: [¶] (1) The crimes and their objectives were predominantly independent of each other; [¶] (2) The crimes involved separate acts of violence or threats of violence; or [¶] (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior. [¶] **(b) Other criteria and limitations:** [¶] Any circumstances in aggravation *or mitigation* may be considered in deciding whether to impose consecutive rather than concurrent sentences, except: [¶] (1) A fact used to impose the upper term; [¶] (2) A fact used to otherwise enhance the defendant's prison sentence; and [¶] (3) A fact that is an element of the crime may not be used to impose consecutive sentences." (Rule 4.425, italics added.)

Here, with respect to imposing consecutive sentences for Counts Two through Five (§§ 664/187), i.e., the four attempted murders, the trial court stated: "The Court finds that each of those offenses was a separate act of violence, and I will articulate this factual finding as it relates to each of them. [¶] This is not a situation where there [were] only one or two shots fired. Factually in this case, multiple guns were basically unloaded. [¶] And it is quite clear that it is appropriate, in the Court's view, to recognize the imposition of a separate sentence as it relates to each of the individual victims in this case." We do not dispute these are appropriate reasons for imposing consecutive sentences. (See *People v. Thurs* (1986) 176 Cal.App.3d 448, 451-453 [trial court may impose consecutive sentences for separate acts of violence against multiple victims].) However, as previously explained, where the defendant is a juvenile, and the result of imposing consecutive sentences is an aggregate prison term that is the functional equivalent of LWOP, the Eighth Amendment requires the trial court to specifically consider "all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development," before imposing such a harsh sentence. (*Caballero*, *supra*, 55 Cal.4th at pp. 268-269.) Thus, while rule 4.425 provides circumstances in mitigation "may be considered," the circumstances of this case required the trial court to consider such mitigating circumstances, separately with respect to each juvenile offender, as a matter of constitutional law.

The record is unclear as to whether this occurred. After stating its reasons for imposing consecutive sentences on Counts Two through Five (§§ 664/187), the trial court stated it would run *one* 25-years-to-life firearm enhancement, i.e., that attached to Count Five, concurrently "in light of the constitutional scheme argued by defense." Thus, it appears the trial court considered the constitutional arguments raised by Adam and Isaac

44

and agreed the probation officer's recommendation would amount to cruel and unusual punishment. However, running one of the firearm enhancements concurrently did not reduce the sentence below that of a functionally equivalent LWOP. As a practical matter, there is no difference between the sentence recommended by probation (170 years to life plus 37 years 4 months), the sentence the trial court would have imposed without running one firearm enhancement concurrently (145 years to life plus 9 years 4 months), and the sentence actually imposed (120 years to life plus 9 years 4 months). In other words, if an individualized consideration of "all mitigating circumstances attendant in the juvenile's crime and life" (*Caballero*, *supra*, 55 Cal.4th at p. 268), would have rendered the functional LWOP sentence recommended by the probation department a violation of the Eighth Amendment, then the sentence imposed by the trial court—also a functional LWOP—was also a violation of the Eighth Amendment. At the same time, if the trial court did consider "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison" (*Miller*, *supra*, 132 S.Ct at p. 2469), but nevertheless concluded these particular juveniles were deserving of spending the rest of their lives in prison without possibility of parole, there would be no such violation. The problem is the record does not reveal which occurred.

## C.

### *Remedy*

In light of the importance of this constitutional right, and uncertainty as to whether the trial court took into account all mitigating circumstances pertaining to these particular juveniles, we concluded in our original opinion the appropriate remedy was to remand for a new sentencing hearing. In so concluding, we rejected the Attorney General's argument SB 260 rendered resentencing unnecessary because, under newly-enacted section 3051, Adam and Isaac will be afforded a meaningful opportunity for parole "during [their] 25th year of incarceration" (*id*., subd. (b)(3)), i.e., within their natural life

45

expectancies. After granting rehearing and receiving supplemental briefing on the effect, if any, of the United States Supreme Court's recent decision in *Montgomery*, *supra*, 136 S.Ct. 718, we remain convinced remand is necessary.

The Legislature passed SB 260 in response to *Miller*, *supra*, 567 U.S. ___ [132 S.Ct. 2455, 183 L.Ed.2d 407] and *Caballero*, *supra*, 55 Cal.4th 262. The Legislature noted the bill "recognizes that youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of society," and declared: "The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in [*Caballero*] and the decisions of the United States Supreme Court in [*Graham, supra,* 560 U.S. 48], and [*Miller*]. It is the intent of the Legislature to create a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established." (SB 260, § 1 (2013–2014 Reg. Sess.).) To effectuate the Legislature's intent, SB 260 added section 3051 to the Penal Code, which requires the Board of Parole Hearings (the Board) to conduct youth offender parole hearings during the 15th, 20th, or 25th year of incarceration. (§ 3051, subd. (b), Stats. 2013, ch. 312, § 4.) A youthful offender whose sentence is a term of 25 years to life or greater is "eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions." (§ 3051, subd. (b)(3); SB 260, § 4 (2013–2014 Reg. Sess.).) In conducting youth offender parole hearings under section 3051, the Board is required to "give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth,

and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (§ 4801, subd. (c); Stats. 2013, ch. 312, § 5.) If the youthful offender is found suitable for parole by the Board, he or she must be released even if the full term originally imposed has not yet been completed. (§ 3046, subd. (c).)

As we explained in our original opinion, despite the fact SB 260 provides what may be considered a "safety net," providing a juvenile offender the opportunity for a parole hearing during his or her lifetime, the new legislation does not substitute for the sentencing court's consideration of all individual characteristics of the offender. In *Miller*, *supra*, 567 U.S. ___ [132 S.Ct. 2455, 183 L.Ed.2d 407] the United States Supreme Court held imposition of an LWOP sentence for a homicide committed as a juvenile constitutes a task "demanding individualized sentencing" and requiring "that *a sentencer have the ability to consider the 'mitigating qualities of youth.'*" (*Miller*, *supra*, 132 S.Ct. at p. 2467, quoting *Johnson v. Texas* (1993) 509 U.S. 350, 367 [113 S.Ct. 2658, 125 L.Ed.2d 290], italics added.) *Caballero*, which extended *Graham*'s prohibition of an LWOP sentence for juveniles convicted of nonhomicide offenses to sentences that are the functional equivalent of LWOP, also emphasized: "[T]he *sentencing court* must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, *so that it can impose a time when the juvenile offender will be able to seek parole from the* [*Board*]." (*Caballero*, *supra*, 55 Cal.4th at pp. 268-269, italics added.) As we have already explained, while *Graham*'s categorical ban on an LWOP sentence or its functional equivalent does not apply in this homicide case, under *Miller, supra*, 132 S.Ct. 2455, the sentencing court was still required to consider all mitigating circumstances of youth before imposing a sentence the functional equivalent of LWOP. Thus, the penalty selection that comports with *Miller* must be undertaken in the first

47

instance by the sentencing court. Regardless of whether the new statutory scheme enacted by SB 260 may eventually convert an LWOP sentence to one with possibility of parole, the sentencing court must consider the factors of youth and maturity *when selecting the initial punishment*.

Our dissenting colleague concludes SB 260 has converted what would otherwise be the functional equivalent of an LWOP sentence into one with the possibility of parole, thereby obviating the sentencing court's obligation to engage in any consideration of youth before imposing such a sentence. We disagree. While SB 260 promises a parole hearing will be held within a juvenile homicide offender's natural life, the statutory language does nothing to convert the originally-imposed sentence into a term of 15, 20, or 25 years to life. If it did, we could simply modify the judgments entered against Adam and Isaac in this case to reflect terms of 25 years to life and be done with it. But that is not what section 3051 says. As relevant to Adam and Isaac, it simply provides for a parole hearing during their 25th year of incarceration. Should this provision be repealed in the meantime, their originally-imposed sentences would remain operative. Nor are we persuaded by our dissenting colleague's assessment that the prospect of such a repeal is "highly unlikely." We have no way of knowing the intentions of a future Legislature. And while such a hypothetical repeal would undoubtedly be challenged in the courts, the question of its constitutionality is not before us for the obvious reason it has not yet happened, and may never happen. What is certain, however, is the trial court imposed sentences on Adam and Isaac that, by their terms, do not provide them with the possibility of parole during their natural lives. These sentences will hang over their heads until the parole hearing promised by SB 260 comes to pass. Thus, while SB 260 may eventually remedy the *Miller* violation by offering an opportunity for parole, it has not yet done so. We therefore conclude the appropriate remedy is to remand the matter for a

new sentencing hearing that comports with *Miller*, *supra*, 567 U.S. ___ [132 S.Ct. 2455, 183 L.Ed.2d 407].

This conclusion is bolstered by our Supreme Court's decision in *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*), involving consolidated cases in which two separate defendants committed special circumstance murder while 17 years old. (*Id.* at p. 1360.) The trial courts imposed LWOP sentences on each defendant under section 190.5, subdivision (b), that had been construed to create a presumption in favor of LWOP sentences for special circumstance murders committed by 16- and 17-year–old offenders. (*Ibid.*) Our Supreme Court harmonized section 190.5, subdivision (b), with Eighth Amendment protections by holding trial courts have discretion to sentence a youthful offender to serve 25 years to life or LWOP with no presumption in favor of the LWOP option. (*Id.* at pp. 1371–1379.) Because the defendants in *Gutierrez* had been sentenced under the prior, prevailing presumption in favor of LWOP, our Supreme Court held resentencing was required. (*Id.* at pp. 1361, 1379.)

In so holding, the court rejected the Attorney General's argument that the recent enactment of section 1170, subdivision (d)(2), "removes life without parole sentences for juvenile offenders from the ambit of *Miller*'s concerns because the statute provides a meaningful opportunity for such offenders to obtain release," explaining: "*Graham* spoke of providing juvenile offenders with a 'meaningful opportunity to obtain release' as a constitutionally required alternative to—not as an after-the-fact corrective for— '*making the judgment at the outset* that those offenders never will be fit to reenter society.' [Citation.] Likewise, *Miller*'s 'cf.' citation to the 'meaningful opportunity' language in *Graham* occurred in the context of prohibiting 'imposition of that harshest prison sentence' on juveniles under a mandatory scheme. [Citation.] Neither *Miller* nor *Graham* indicated an opportunity to recall a sentence of life without parole 15 to 24 years into the future would somehow make more reliable or justifiable the imposition of that

sentence and its underlying judgment of the offender's incorrigibility 'at the outset.' [Citation.]  [¶]  Indeed, the high court in *Graham* explained that a juvenile offender's subsequent failure to rehabilitate while serving a sentence of life without parole cannot retroactively justify imposition of the sentence in the first instance:  'Even if the State's judgment that Graham was incorrigible were later corroborated by prison misbehavior or failure to mature, the sentence was still disproportionate *because that judgment was made at the outset.*'  [Citation.]  By the same logic, it is doubtful that the potential to recall a life without parole sentence based on a future demonstration of rehabilitation can make such a sentence any more valid when it was imposed.  If anything, a decision to recall the sentence pursuant to section 1170[, subdivision] (d)(2) is a recognition that the initial judgment of incorrigibility underlying the imposition of life without parole turned out to be erroneous.  Consistent with *Graham, Miller*[, *supra*, 567 U.S. ___ [132 S.Ct. 2455, 183 L.Ed.2d 407]] repeatedly made clear that the sentencing authority must address this risk of error by considering how children are different and how those differences counsel against a sentence of life without parole '*before* imposing a particular penalty.' [Citations.]"  (*Gutierrez*, *supra*, at pp. 1386–1387.)

In short, our Supreme Court has recognized a statutory promise of future correction of a presently unconstitutional sentence does not alleviate the need to remand for resentencing that comports with the Eighth Amendment.

The United States Supreme Court's recent decision in *Montgomery*, *supra*, 136 S.Ct. 718, does not alter our conclusion.  There, the court held *Miller*, *supra*, 567 U.S. ___ [132 S.Ct. 2455, 183 L.Ed.2d 407] announced a substantive rule of constitutional law that must be applied retroactively to juvenile offenders whose convictions and sentences were final when *Miller* was decided.  (*Montgomery, supra,* 136 S.Ct. at p. 736.)  In concluding *Miller* set forth a "substantive rule [that] eliminated a State's power to . . . impose a given punishment" (*Montgomery, supra,* at p. 730), such as in *Roper*, *supra*,

50

543 U.S. 551 [barring death penalty for minors] and *Graham*, *supra*, 560 U.S. 48 [barring LWOP sentence for minors convicted of a nonhomicide offense], the court explained *Miller, supra,* 183 L.Ed.2d 407 barred imposition of a sentence of LWOP, even for homicide offenses, "for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility. For that reason, *Miller* is no less substantive than are *Roper* and *Graham*. Before *Miller*, every juvenile convicted of a homicide offense could be sentenced to life without parole. After *Miller*, it will be the rare juvenile offender who can receive that same sentence. The only difference between *Roper* and *Graham*, on the one hand, and *Miller*, on the other hand, is that *Miller* drew a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption." (*Montgomery, supra,* 136 S.Ct. at p. 734.) Acknowledging *Miller*'s holding also "has a procedural component . . . requir[ing] a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence," the court explained this procedural requirement "gives effect to *Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." (*Id*. at pp. 734-735.)

In apparent response to a point made in Justice Scalia's dissent, i.e., it would be "silliness" to expect a trial court to be able to resolve the question of "whether a 17-year-old who murdered an innocent sheriff's deputy half a century ago was at the time of his trial 'incorrigible'" (*Montgomery*, *supra*, at p. 744 (dis. opn. of Scalia, J.)), the majority opinion stated giving *Miller* retroactive effect "does not require States to relitigate sentences," explaining: "A State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them. See, *e.g.*, Wyo. Stat. Ann. § 6-10-301(c) (2013) (juvenile homicide offenders eligible for parole after 25 years). Allowing those offenders to be considered for parole ensures that

51

juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." (*Id*. at p. 736.)

Thus, the substantive rule the *Montgomery* court held to apply retroactively to juvenile offenders whose convictions and sentences were final when *Miller* was decided was that "life without parole is an excessive sentence for children whose crimes reflect transient immaturity" as opposed to "irreparable corruption." (*Montgomery*, *supra*, at pp. 734-735.) However, while the procedure set forth in *Miller*, *supra*, 567 U.S. ___ [132 S.Ct. 2455, 183 L.Ed.2d 407] for determining on which side of the line a juvenile offender lands, i.e., individualized sentencing at the outset, makes perfect sense where the goal is to avoid *imposition* of an unconstitutional sentence, such a procedure makes far less sense after decades of incarceration. There being no requirement such a *procedure* be applied retroactively, where a juvenile offender's LWOP sentence became final before *Miller* was decided, a State may remedy the violation by providing for parole consideration.

Here, like *Gutierrez*, and unlike *Montgomery*, we are directly reviewing the legality of a sentence. While *Miller*'s "procedural component," i.e., the requirement that the "sentencer [must] consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence" (*Montgomery*, *supra*, 136 S.Ct. at p. 734), need not be applied retroactively in collateral proceedings, *Montgomery* does not hold it may also be dispensed within the context of a direct appeal. And while SB 260, unlike section 1170, subdivision (d), does provide an opportunity for parole, as opposed to an opportunity for recall and resentencing, we do not believe the promise of such an opportunity 25 years after the fact somehow makes more reliable or justifiable the trial court's implicit determination Adam and Isaac are irreparably corrupt

52

"'at the outset.'"  (*Gutierrez*, *supra*, 58 Cal.4th at p. 1386, quoting *Graham*, *supra*, 560 U.S. at p. 75.)

Accordingly, with respect to Adam and Isaac, we still conclude the matter must be remanded to the trial court for a new sentencing hearing.

## ISAAC'S REMAINING CONTENTIONS

## VIII

### *Rule of Completeness*

Isaac contends the trial court prejudicially erred and violated his constitutional rights by allowing one of the detectives in the case to convey a misleading portion of his police statement rather than require the prosecution to play the entire statement for the jury.  We disagree.

### A.

### *Additional Background*

Ellison was killed by a 9-millimeter bullet.  Police found multiple 9-millimeter and 10-millimeter shell casings in the street in front of Ellison's house.  As mentioned, they found the corresponding 10-millimeter handgun along the chase route.  However, while police also found a magazine for a 9-millimeter handgun along the chase route, they did not find the gun itself.

Detective Kirtlan interviewed Isaac after the shooting.  The detective told Isaac police had found the 10-millimeter handgun and the 9-millimeter magazine, but were still looking for the 9-millimeter handgun.  He also explained it was a "public safety issue" to have a gun left out on the street, especially since there would be children walking down that street on their way to school the next morning.  Isaac then discussed the matter with his stepmother, who had joined him in the interview room, and ultimately agreed to point out the location of the missing handgun.  The detective brought in a map of the area and Isaac pointed out the location he believed "they threw it out."

53

The prosecution moved in limine to be allowed to elicit testimony from Detective Kirtlan that Isaac told him the location he believed police would be able to find the gun, despite the fact Isaac "arguably" invoked his right to remain silent under *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (*Miranda*) prior to providing the location, under "the 'public safety' exception to the *Miranda* rule."**8**  The prosecutor explained:  "What I proposed rather than playing the tape was to ask Detective Kirtlan did you receive information from [defendant] Isaac Vasquez as to where you might find the missing nine millimeter gun?  Yes.  Did you look for it in that location? Yes.  Did you find it?  No."

In response, Isaac's trial counsel argued:  "I think that there is . . . [an Evidence Code section] 356 problem.  I think that the throwing of the gun is being used to show consciousness of guilt, whereas Isaac's statement during this long period that he was interrogated and questioned was that this was self-defense.  So I think that you need to get in the entire statement so that the jury could, in essence, understand that."  Counsel also expressed concern that limiting the testimony to Isaac providing the location of the gun "gives a false impression that if he's saying where the gun was thrown, then it gives the impression that he threw the gun, and that's a significant issue."

The prosecutor argued in reply:  "As far as [Evidence Code section] 356, I don't know that there is anything in his self-serving statements to [Isaac's stepmother] or even his inculpatory statements to [his stepmother] that explained the limited part that I'm trying to get out, where could they look for the gun.  [¶]  One of the things that has already been raised here by [counsel for Jesse] is that the police didn't do their job, didn't look for the .40 caliber, didn't even bother to look for the .40 caliber, didn't even bother

_____

**8**     Because Isaac's argument on appeal does not claim a *Miranda* violation occurred, we do not set forth the parties' arguments regarding this issue.

to find it.  Now, that's the one that was used by Latrele Neal.  But it should at least be shown that the officers made attempts to find the outstanding nine millimeter.  [¶] Because one of the other arguments counsel can make, well, maybe if we had the nine millimeter we could have -- if they had done their job and looked for that maybe we could have done some testing on that or figured out which one of them fired it.  There's nothing in any of the witness statements, even the witnesses who saw the ten millimeter being thrown from the car that indicates who in the car threw it.  [¶]  Now, in his statement, that portion of it I think he indicates or the officer indicates that it was thrown from the driver's side window.  I'm not implying that we know who threw the gun.  I'm simply trying to get before the jury that the officers attempted to locate it.  They attempted to get information.  They got information, and they went to look for it.  But there's nothing in the statements that he makes to [his stepmother] or the lies that he makes to Detective Kirtlan initially that explains that or adds to it or clears anything up."

The trial court ruled that admitting the fact Isaac provided the location of the gun to police would not violate *Miranda*.  The trial court further ruled Evidence Code section 356 did not require "allowing an entire expansive rambling statement encompassing a number of topics to address a sole and easily isolated question such as we have in this case."  Finally, the court explained the prosecution's intended use of Isaac's statement as to the location of the 9-millimeter handgun did not "over-implicate" Isaac or "misrepresent" he was the one who threw the gun out of the Explorer.

In accordance with the trial court's ruling, during the prosecution's examination of Detective Kirtlan, the following exchange occurred:

"Q     Did you receive information from [defendant] Isaac Vasquez about the location of a missing nine-millimeter semiautomatic handgun?

"A     Yes, I did.

55

"Q      Did you go to the area after receiving that information and search the area where it was thought that that gun might be?

"A      Yes, ma'am.

"Q      And where was that location?

"A      Essentially in the area of Northgate and Striker in North Sacramento.

"Q      Now, is that an area where other evidence had been located?

"A      Yes, ma'am.

"Q      What other evidence had been located there?

"A      A magazine to a nine-millimeter semiautomatic handgun.

"Q      Did you find the nine-millimeter semiautomatic handgun?

"A      No, we did not."

## B.

### *Analysis*

Evidence Code section 356 provides:  "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole *on the same subject* may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."  (Italics added.)

This provision "is sometimes referred to as the statutory version of the common-law rule of completeness.  [Citation.]  According to the common-law rule:  "'[T]he opponent, against whom a part of an utterance has been put in, may in his [or her] turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance." [Citation.]' [Citation.]" (*People v. Parrish* (2007) 152 Cal.App.4th 263, 269, fn. 3.)  The purpose of the rule "is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as

to create a misleading impression on the subjects addressed.  [Citation.]  Thus, if a party's oral admissions have been introduced in evidence, he [or she] may show other portions of the same interview or conversation, even if they are self-serving, which 'have some bearing upon, or connection with, the admission . . . in evidence.'  [Citations.]"  (*People v. Arias* (1996) 13 Cal.4th 92, 156.)  We review the trial court's determination of whether or not to admit evidence under this provision for abuse of discretion.  (See *People v. Pride* (1992) 3 Cal.4th 195, 235.)

Here, Detective Kirtlan testified Isaac told him where the 9-millimeter handgun could be found, and after receiving this information, he went to a certain location where police found a magazine to a 9-millimeter handgun, but not the gun itself.  Implicit in this testimony is that Isaac told the detective the gun could be found at that particular location.  From this, and the fact the location was along the chase route, the jury could infer *someone* in the Explorer threw the gun out of the vehicle during the chase.  The testimony does not reveal who threw the gun.  Thus, the concern raised below that the testimony would misleadingly suggest Isaac was the one who threw the 9-millimeter handgun, and therefore likely fired the shot that killed Ellison, was obviated by the actual testimony received into evidence.  Indeed, the prosecutor never argued, in either her closing or rebuttal argument, that Isaac fired the fatal shot.  Instead, she specifically conceded, "we don't know who had the nine and who had the ten."

The other argument for admission of the entire statement, which was raised below, was the jury should hear the entirety of Isaac's statement, including the portion indicating the shooting was done in self-defense, to balance out the suggestion that throwing the gun out of the Explorer evidenced Isaac's consciousness of guilt.  However, the trial court appeared to credit the prosecutor's assurance Isaac's statement as to where the 9-millimeter handgun could be found was being offered solely on the issue of whether the police conducted a thorough investigation.  (See 4 Jones on Evidence (7th ed. 2014) §

24:26 ["where the defendant challenges the investigation as unprofessional or sloppy or claims that he [or she] was falsely accused, the prosecutor should be entitled to spell out the investigation in greater detail to rebut this defense"].) The prosecutor lived up to this assurance. At no point in her arguments to the jury did she argue the fact Isaac threw a handgun from the SUV evidenced his consciousness of guilt. Moreover, the rule of completeness prevents "'the use of selected aspects of a [statement] so as to create a misleading impression *on the subjects addressed*,'" and therefore "hinges on the requirement that the two portions of a statement be '*on the same subject*.'" (*People v. Vines* (2011) 51 Cal.4th 830, 861, italics added.) Here, whether Isaac told Detective Kirtlan where to find the 9-millimeter handgun is not the same subject as whether the shooting itself was done in self-defense. We acknowledge narrow lines should not be drawn around the exact subject of inquiry (*People v. Zapien* (1993) 4 Cal.4th 929, 959), but the statutory language "on the same subject" cannot be rendered meaningless by an interpretation that draws no lines at all. (Evid. Code, § 356.)

Finally, we note Isaac raises a separate issue for the first time on appeal. He argues his exact statement to Detective Kirtlan, i.e., "they throwed it out" should have been admitted because it "was exculpatory in that it supported an inference that [Isaac] did not shoot the [9-millimeter] gun that killed Ellison." Acknowledging admission of Isaac's statement, "they throwed it out" at the joint trial in this case, where Isaac did not testify, would have potentially violated his codefendants' confrontation rights under *People v. Aranda* (1965) 63 Cal.2d 518 and *Bruton v. United States* (1968) 391 U.S. 123 [88 S.Ct. 1620, 20 L.Ed.2d 476], Isaac argues the redaction of this statement to simply indicate he told Detective Kirtlan where the gun could be found prejudiced his defense. This argument is forfeited for failure to raise it in the trial court. (See *People v. Hill* (1992) 3 Cal.4th 959, 994-995, overruled on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1075.)

The trial court did not abuse its discretion in ruling Evidence Code section 356 did not require admission of Isaac's entire statement to Detective Kirtlan.

## IX

### *Cumulative Prejudice*

Finally, we reject Isaac's assertion the cumulative effect of the foregoing assertions of error require reversal. We have reversed Isaac's gang enhancement and vicarious firearm enhancement findings and remanded the matter to the trial court for a new sentencing hearing that comports with the Eighth Amendment. This does not, however, affect Isaac's convictions or remaining enhancement findings. The only other meritorious claim of error, i.e., the instructional error, we concluded was harmless. Accordingly, there is no prejudice to cumulate.

## DISPOSITION

The judgment entered against Jesse Cornejo is modified to strike the gang enhancement under Penal Code section 186.22, subdivision (b), and vicarious firearm enhancement under Penal Code section 12022.53, subdivision (e)(1), as well as the sentences imposed thereon. As modified, the judgment is affirmed. The trial court is directed to amend his abstract of judgment to reflect the modifications and to indicate the victim restitution order is a joint and several obligation and to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

The judgments entered against Adam Cornejo and Isaac Vasquez are reversed, although their convictions and enhancement findings shall stand, with the exception of the gang enhancement under Penal Code section 186.22, subdivision (b), and vicarious firearm enhancement under Penal Code section 12022.53, subdivision (e)(1), which are also reversed. With respect to these defendants, the matter is remanded to the trial court for a new sentencing hearing during which the trial court shall consider all mitigating circumstances pertaining to these particular juveniles in determining whether to employ

59

consecutive sentences to impose an aggregate sentence that is the functional equivalent of life without parole.  Following this new sentencing hearing, their respective amended abstracts of judgment shall also reflect that any victim restitution order imposed by the trial court is a joint and several obligation.  The trial court is directed to forward certified copies of these respective amended abstracts of judgment to the Department of Corrections and Rehabilitation.


                                                /s/
                                           HOCH, J.


I concur:


      /s/
HULL, Acting P. J.

MURRAY, J.

I concur in the majority opinion except for discussion part VII and the conclusion that the Eighth Amendment requires a remand for a new sentencing hearing for Adam and Isaac. As to that part of the majority opinion, I respectfully dissent.[1]

It is my view that Senate Bill No. 260 (2013-2014 Reg. Sess.) (S.B. 260) fixed the Eighth Amendment defect in California's sentencing scheme related to indeterminate sentences for juvenile offenders. This view has since been validated by the United States Supreme Court in *Montgomery v. Louisiana* (2016) 577 U.S. ___ [136 S.Ct. 718, 193 L.Ed.2d 599] (*Montgomery*).

As explained by the courts in *Graham v. Florida* (2010) 560 U.S. 48, 75, 82 [130 S.Ct. 2011, 176 L.Ed.2d 825] (*Graham*), *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455, 183 L.Ed.2d 407] (*Miller*), and *Montgomery, supra*, 136 S.Ct. at pp. 726, 732-733, the Eighth Amendment prohibition against cruel and unusual punishment is implicated where a mandatory sentence of life without the possibility of parole (LWOP) is imposed on a juvenile. As the high court has explained, " 'By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence,' *mandatory life without parole* 'poses too great a risk of disproportionate punishment.' [Citation.] *Miller* required that sentencing courts consider a child's 'diminished culpability and heightened capacity for change' *before condemning him or her to die in prison*. [Citation.] Although *Miller* did not foreclose a sentencer's ability to impose life without

---

[1] I do agree with the majority to the extent they suggest that on remand, the trial court's resentencing discretion is limited to reducing the sentence to one that is statutorily authorized. (Maj. opn., *ante*, p. 43 [noting that the trial court is required to impose 20 years to life on count one and 25 years to life for the firearm enhancement on count one, for a total of 45 years to life on count one, but that the trial court could run the additional sentences for the other counts and their enhancements concurrent to count one].) The trial court cannot impose some lesser sentence -- at least not without statutory authority or a constitutional mandate and guidance about how to arrive at such a sentence from the California Supreme Court.

1

parole on a juvenile, the Court explained that a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect ' "irreparable corruption." ' " (*Montgomery*, at p. 726, quoting *Miller*, at p. 2469.)

Expanding *Graham* and *Miller*, the California Supreme Court explained in *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*) that the Eighth Amendment prohibition is also implicated where a court imposes a de facto LWOP sentence that deprives a juvenile offender of any realistic opportunity to demonstrate maturity and rehabilitation and thereby obtain release on parole. However, because S.B. 260 now provides juvenile offenders sentenced to indeterminate terms an opportunity to obtain parole, a trial court's indeterminate term sentence (no matter how long it is) no longer has the effect of depriving juvenile defendants of that opportunity *at the outset*. Furthermore, as I will explain, the death penalty analogy underlying the *Miller* requirement for individualized sentencing consideration as an Eighth Amendment imperative does not apply to indeterminate sentences imposed on juveniles post-S.B. 260.

To be clear, a state certainly may require trial courts to engage in *Miller*-style individualized sentencing consideration before imposing a lengthy indeterminate term sentence on a juvenile. In light of the fact that juvenile offenders are different from adult offenders, such a requirement would be entirely reasonable. However, the California Legislature has thus far opted to address the constitutional concern about the risk of disproportionate punishment where a juvenile is effectively *condemned to die in prison* by providing an opportunity for parole for such offenders. That is all that is constitutionally required from an Eighth Amendment perspective.

**A. The Sentencing Context in *Graham*, *Miller*, and *Caballero***

I begin my analysis of the impact of S.B. 260 with the sentencing context that led to the decisions in *Graham*, *Miller*, and *Caballero*, because that context is key to the reasoning and holdings in those cases. In *Graham* and *Miller*, the United States Supreme Court addressed sentencing schemes involving mandatory LWOP sentences for juvenile

offenders who were convicted of nonhomicide offenses (*Graham, supra*, 560 U.S. at pp. 52-53) and homicide offenses (*Miller, supra*, 132 S.Ct. at p. 2461). Were it not for the unconstitutional sentencing schemes that provided no opportunity for parole addressed in *Graham* and *Miller*, it seems unlikely California courts would be having this current conversation. The California Supreme Court extended *Graham* and *Miller* to apply to lengthy indeterminate sentences in nonhomicide cases that are the functional equivalent of LWOP. The *Caballero* court defined such de facto LWOP sentences as a sentence with a parole eligibility date that falls outside the natural life expectancy of the juvenile defendant. (*Caballero, supra*, 55 Cal.4th at pp. 267-268.) That definition is consistent with the United States Supreme Court's concern that LWOP sentences are the equivalent *condemning juvenile offenders to die in prison*. (*Montgomery, supra*, 136 S.Ct. at p. 726, citing *Miller*, at p. 2469.) Thus, the key fact in *Graham*, *Miller*, and *Caballero* that implicated the Eighth Amendment prohibition against cruel and unusual punishment was that there was *no opportunity for parole* available to the juvenile defendants.

## B. The Constitutional Mandate - What States Must Do

The court in *Graham* specifically noted what states must do to comply with the Eighth Amendment. "A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State *must do*, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for the State, in the first instance, to explore the means and mechanisms for compliance." (*Graham, supra*, 560 U.S. at p. 75, italics added.) Later in the opinion, the *Graham* court again emphasized its only mandate for states. "A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term." (*Id.* at p. 82.)

3

Our high court in *Caballero* recognized *Graham*'s mandate, a mandate that does not focus on the sentence imposed, but rather on the realistic opportunity for parole. The *Caballero* court observed, "*Graham*'s *analysis does not focus on the precise sentence meted out.* Instead, . . . it holds that a state must provide a juvenile offender 'with some realistic opportunity to obtain release' from prison during his or her expected lifetime." (*Caballero, supra*, 55 Cal.4th at p. 268, italics added.) Based on *Graham* and *Miller*, our high court in *Caballero* suggested that the Legislature fix the Eighth Amendment defect in California's juvenile sentencing scheme and offered a suggestion on how that could be done for nonhomicide crimes. In footnote five, the *Caballero* court wrote, "We urge the Legislature to enact legislation establishing a parole eligibility mechanism that provides a defendant serving a de facto life sentence without possibility of parole for nonhomicide crimes that he or she committed as a juvenile with the opportunity to obtain release on a showing of rehabilitation and maturity." (*Caballero*, at p. 269, fn. 5.) In response, the Legislature did just that and more. S.B. 260, effective January 2014, cures the Eighth Amendment defect by creating a parole mechanism in section 3051[2] that makes it impossible for any indeterminate sentence imposed on a juvenile to function as the equivalent of an LWOP sentence. (§ 3051, added by Stats. 2013, ch. 312, § 4.)

## C. The California Legislature's Fix - Senate Bill No. 260

Section 1 of S.B. 260 states in relevant part: "The Legislature finds and declares that, as stated by the United States Supreme Court in *Miller*[*, supra*, 132 S.Ct. 2455], 'only a relatively small proportion of adolescents' who engage in illegal activity 'develop entrenched patterns of problem behavior,' and that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds,' including 'parts of the brain involved in behavior control.' The Legislature recognizes that youthfulness both lessens a juvenile's moral culpability and enhances the

---

[2] Undesignated statutory references are to the Penal Code.

prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of society. The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in [*Caballero*] and the decisions of the United States Supreme Court in [*Graham*], and [*Miller*]." (Legis. Counsel's Dig., Sen. Bill No. 260, Stats. 2013, ch. 312, § 1 (2013-2014 Reg. Sess.).)

With exceptions not applicable here (see fn. 6, *post*), section 3051 provides an opportunity for a juvenile offender to be released on parole by requiring the Board of Parole Hearings (the Board) to conduct "youth offender parole hearing[s]" on a set schedule depending on the length of the inmate's sentence. Indeed, effective January 1, 2016, offenders who were under the age of 23 at the time of the offense are now eligible for parole under section 3051. (Legis. Counsel's Dig., Sen. Bill No. 261, Stats. 2015, ch. 471, § 1 (2015-2016 Reg. Sess.).) Specifically, youth offender parole hearings are to be held during the 15th year of incarceration for an inmate serving a determinate sentence (§ 3051, subd. (b)(1)), during the 20th year of incarceration for an inmate serving a life term less than 25 years to life (§ 3051, subd. (b)(2)), and during the 25th year of incarceration for a prisoner serving a life term of 25 years to life (§ 3051, subd. (b)(3)).[3]

_____

[3] The Legislature also enacted provisions governing parole hearings for these inmates. Section 3051, subdivision (e), provides that "[t]he youth offender parole hearing to consider release shall provide for *a meaningful opportunity to obtain release*. The board shall review and, as necessary, revise existing regulations and adopt new regulations regarding determinations of suitability made pursuant to this section, subdivision (c) of Section 4801, and other related topics, consistent with relevant case law, in order to provide that meaningful opportunity for release." (Italics added.) Section 4801, subdivision (c), provides: "(c) When a prisoner committed his or her controlling offense . . . prior to attaining 23 years of age, the board, in reviewing a prisoner's suitability for parole pursuant to Section 3041.5, shall give *great weight to the diminished culpability of*

Thus, the Legislature went further than suggested by the California Supreme Court and created a mechanism applicable to most juvenile offenders convicted in adult court, including those guilty of homicide crimes.

### D. Analysis

S.B. 260 applies here. Both Adam and Isaac will have their first parole hearing during their 25th year of incarceration, just as if they had been sentenced to only 25 years to life. Their sentences, therefore, are not the functional equivalent of LWOP; they are no longer effectively condemned to die in prison. Adam and Isaac will have a realistic opportunity for parole on a date that falls well within their natural life expectancy. Consequently, their sentences do not violate the Eighth Amendment.

The majority says this is not enough. The majority concludes that "[t]here can be no doubt the sentence imposed in this case, i.e., 120 years to life plus 9 years 4 months, is the functional equivalent of LWOP" and goes on to state that, at sentencing, the Eighth Amendment requires the trial court to specifically consider the attributes of youth and all mitigating circumstances before imposing such a sentence. (Maj. opn., *ante*, p. 42.) But the premise that the sentences here continue to be the functional equivalent of LWOP after S.B. 260 is wrong. No indeterminate sentence imposed on a juvenile can be considered the functional equivalent of LWOP after S.B. 260. This is necessarily true because, by definition, an LWOP sentence means incarceration *without the possibility for*

---

*juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner* in accordance with relevant case law." (Italics added.) Section 3051, subdivision (f), states in part: "(1) In assessing growth and maturity, psychological evaluations and risk assessment instruments, if used by the board, shall be administered by licensed psychologists employed by the board and shall take into consideration the diminished culpability of juveniles as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual. [¶] (2) Family members, friends, school personnel, faith leaders, and representatives from community-based organizations with knowledge about the individual before the crime or his or her growth and maturity since the time of the crime may submit statements for review by the board." (§ 3051, subd. (f).)

6

*parole*.  As noted, our Supreme Court has defined the functional equivalent of LWOP as a sentence that results in "a parole eligibility date that falls outside the juvenile offender's natural life expectancy." (*Caballero, supra*, 55 Cal.4th at p. 268.)  That definition is consistent with the United States Supreme Court's concern that LWOP sentences are the equivalent of *condemning juvenile offenders to die in prison*. (*Montgomery, supra*, 136 S.Ct. at p. 726, citing *Miller, supra*, 132 S.Ct. at p. 2469.)  After S.B. 260, no juvenile sentenced to a lengthy indeterminate sentence can be considered to have been condemned to die in prison because no indeterminate sentence can function as the equivalent of LWOP.  All juvenile offenders sentenced before and after the enactment of S.B. 260, including Adam and Isaac, now have a parole eligibility date no later than the 25th year of incarceration, well within their life expectancy.

The majority reasons that S.B. 260 did not "convert" what would otherwise be the functional equivalent of LWOP to sentences that carry the possibility of parole.  They say, "While S.B. 260 promises a parole hearing will be held within a juvenile homicide offender's natural life, the statutory language does nothing to convert the originally-imposed sentence into a term of 15, 20, or 25 years to life." (Maj. opn., *ante*, p. 48.)  But there is no constitutional requirement that sentences be reduced or converted; the only requirement is that juvenile defendants be given a realistic opportunity to demonstrate maturity and rehabilitation and thereby obtain release on parole.  And the Legislature has the authority to establish when a person becomes eligible for parole, notwithstanding the minimum sentence imposed.

In my view, the word "convert" is the wrong word to use in describing what S.B. 260 did to the functional equivalent of LWOP.  The appropriate word is "abolish."  S.B. 260 *abolished* the functional equivalent of LWOP for juvenile offenders by eliminating the last three letters in that acronym -- WOP -- which stands for *without the possibility* of parole.

7

Notwithstanding the S.B. 260 abolition of the functional equivalent of LWOP, the majority concludes that *Miller*'s individualized sentencing consideration requirement is still constitutionally compelled by the Eighth Amendment prohibition against cruel and unusual punishment; thus, a sentencing court must consider the *Miller* factors "*when selecting the initial punishment*." (Maj. opn., *ante*, p. 48.) I disagree with the majority's view of *Miller*. The majority correctly notes that the *Miller* court held that the "imposition of an LWOP sentence for a homicide committed as a juvenile constitutes a task '*demanding individualized sentencing*' and requiring 'that *a sentencer have the ability to consider the "mitigating qualities of youth*."'" (*Miller, supra*, 132 S.Ct. at p. 2467, quoting *Johnson v. Texas* (1993) 509 U.S. 350, 367 [113 S.Ct. 2658, 125 L.Ed.2d 290], italics added.)" (Maj. opn., *ante*, p. 47, first italics added.) But the *Miller* court required this individual sentencing consideration as an Eighth Amendment imperative precisely because the *Miller* defendants had been *mandatorily* sentenced to LWOP and for no other reason. The vice of the LWOP sentencing schemes in *Miller* was that the sentencer was prevented from imposing a sentence that provided for an opportunity for parole and thus more proportionate to the crime and the offender. Instead, the sentencer was required to impose LWOP, the "harshest" sentence available for juveniles in all cases. "By removing youth from the balance--by subjecting a juvenile to the same life-without-parole sentence applicable to an adult--these laws prohibit a sentencing authority from assessing whether the law's *harshest term* of imprisonment proportionately punishes a juvenile offender. That contravenes *Graham*'s . . . foundational principle: *that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children*." (*Miller*, at p. 2466, italics added.) The court in *Miller* recognized that in homicide cases an LWOP sentence could constitutionally be imposed when sentencing " 'the rare juvenile offender whose crime reflects *irreparable corruption*,' " but required sentencers "to take into account how

8

children are different, and how those differences *counsel against irrevocably sentencing them to a lifetime in prison.*" (*Id.* at p. 2469, italics added.)

Now, as a result of S.B. 260, juvenile offenders in California are no longer treated as if they are not children, and they are no longer "irrevocably" sentenced to a lifetime in prison. Indeed, defendants here will have a realistic opportunity for parole after 25 years whereas an adult (23 years old and older at the time of the offense) would be effectively condemned to die in prison if given the same sentence. (Legis. Counsel's Dig., Sen. Bill No. 261, Stats. 2015, ch. 471, § 1 (2015-2016 Reg. Sess.).)

In insisting that trial courts expressly consider the *Miller* factors before imposing an indeterminate sentence that would be the functional equivalent of LWOP, the majority and others not only effectively ignore the opportunity for parole provided by S.B. 260, but they also overlook the reason the *Miller* court mandated individual sentencing consideration before condemning juveniles to die in prison. Following its earlier statements in *Graham*, the court in *Miller* equated an LWOP sentence for a juvenile to the death penalty for adults. (*Miller, supra*, 132 S.Ct. at pp. 2463, 2466.) The majority does not account for this, but does quote *Miller's* reference to " '*demanding individualized sentencing*' " before imposing LWOP. (Maj. opn., *ante*, p. 47, italics added.) What the *Miller* court actually said *demanded individual sentencing consideration* at the page cited by the majority was the death penalty precedents where the Eighth Amendment proportionality principle of individual sentencing consideration had its genesis. (*Miller*, at p. 2467.) Specifically, the *Miller* court said, "*Graham*'s '[t]reat[ment] [of] juvenile life sentences as analogous to capital punishment,' [citation]-- makes relevant here a second line of our precedents, *demanding individualized sentencing when imposing the death penalty*." (*Miller*, at p. 2467, italics added.) The Court noted that it had prohibited the mandatory imposition of capital punishment and required sentencing authorities to consider the characteristics of a defendant and the circumstances of the offense before imposing a death sentence. (*Id*. at pp. 2463-2464.)

9

The import of this death penalty analogy -- equating LWOP for juveniles to the death penalty for adults -- cannot be overlooked. It is this analogy that motivated the high court to invoke the Eighth Amendment proportionality rule from the death penalty jurisprudence mandating individualized sentencing consideration for adult offenders and apply that rule to the imposition of LWOP, the harshest sentence that can be imposed on a juvenile. (*Miller*, at pp. 2466-2467, 2471.)

The line of death penalty cases cited by the *Miller* court included *Sumner v. Shuman* (1987) 483 U.S. 66 [107 S.Ct. 2716, 97 L.Ed.2d 56] (*Sumner*) [death penalty case involving an adult defendant], *Eddings v. Oklahoma* (1982) 455 U.S. 104 [102 S.Ct. 869, 71 L.Ed.2d 1] (*Eddings*) [death penalty case involving a 16-year-old defendant], *Lockett v. Ohio* (1978) 438 U.S. 586 [98 S.Ct. 2954, 57 L.Ed. 973] (plur. opn.) (*Lockett*) [death penalty case involving an adult defendant], and *Woodson v. North Carolina* (1976) 428 U.S. 280 [96 S.Ct. 2978, 49 L.Ed.2d 944] (*Woodson*) [death penalty case involving four adult defendants]. To more fully explain how, in the words of *Miller*, the individual sentencing consideration requirement for juveniles subject to LWOP "flows straightforwardly" (*Miller, supra*, 132 S.Ct. at p. 2471) from this death penalty precedent, a short review of these cases is necessary.

In *Furman v. Georgia* (1972) 408 U.S. 238 [92 S.Ct. 2726, 33 L.Ed.2d 346] (*per curiam*), the high court, in effect, invalidated capital punishment statutes that allowed sentencers to determine whether to impose death or LWOP without guided discretion, concluding that statutes permitting juries absolute discretion in making the capital sentencing determination resulted in the arbitrary and capricious imposition of the death penalty, in violation of the Eighth Amendment. (*Sumner, supra*, 483 U.S. at p. 70 [summarizing the import of *Furman*].) Some states responded by making the death penalty mandatory, thereby obviating the need for sentencers to exercise discretion. (*Sumner*, at p. 71.) For example, North Carolina responded by enacting a law that

10

mandated the death penalty for all first degree murder convictions. (*Woodson, supra*, 428 U.S. at p. 286.)

In *Woodson*, the high court observed that the mandatory death penalty laws "enacted in response to *Furman* . . . simply papered over the problem of unguided and unchecked jury discretion." (*Woodson, supra*, 428 U.S. at p. 302.) The *Woodson* court went on to hold that the North Carolina law violated the Eighth Amendment for three reasons, one of which was its "failure to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant." (*Woodson*, at p. 303.) The Court observed, "[a] process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death." (*Id.* at p. 304.) The *Woodson* court then concluded, "While *the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative*, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, [citation], requires consideration of the character and record of the individual offender and the circumstances of the particular offense *as a constitutionally indispensable part of the process of inflicting the penalty of death*. [¶] This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. . . . Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." (*Woodson*, at pp. 304-305, italics added.)

Subsequently, the Court in *Sumner*, *Eddings*, and *Lockett* "elaborated on the requirement that capital defendants have an opportunity to advance, and the judge or jury a chance to assess, any mitigating factors, so that the death penalty is reserved only for the most culpable defendants committing the most serious offenses." (*Miller, supra*, 132 S.Ct. at p. 2467.) In *Johnson v. Texas, supra*, 509 U.S. 353 (*Johnson*), a death penalty case quoted in *Miller* involving a 19-year-old defendant, the high court wrote, "A sentencer in a capital case must be allowed to consider the mitigating qualities of youth in the course of its deliberations over the appropriate sentence." (*Johnson*, at p. 367.)

Years later, in *Roper v. Simmons* (2005) 543 U.S. 551, 578-579 [125 S.Ct. 1183, 161 L.Ed.2d 1] (*Roper*), the United States Supreme Court held that under the Eighth Amendment, juveniles may not be sentenced to capital punishment for any crime. The *Roper* court reasoned that juveniles are less culpable given the attributes of youth and thus are in all cases less deserving of the death penalty than adults. (*Roper*, at pp. 569, 573-575.)

The *Miller* court thus reasoned that "*Graham*, *Roper* and our individualized sentencing decisions make clear that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the *harshest possible penalty* for juveniles. By requiring that all children convicted of homicide receive *lifetime incarceration without possibility of parole*, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory sentencing schemes before us violate this principle of proportionality, and so the Eighth Amendment's ban on cruel and unusual punishment." (*Miller, supra*, 132 S.Ct. at p. 2475, italics added.) Thus, the *Miller* court extended the Eighth Amendment imperative for an individualized sentencing inquiry to juveniles sentenced to LWOP and added the attributes of youth as specific considerations for such cases.

Logically, the individual sentencing consideration required by the Eighth Amendment should apply not only to LWOP but also to sentences that are the functional

equivalent of LWOP, because the *Miller* court's death penalty analogy logically extends to sentences in which a juvenile defendant, in effect, is "irrevocably" sentenced to a lifetime in prison with no opportunity for parole. But the analogy does not extend to indeterminate sentences after S.B. 260 for the obvious reason that when parole is possible, whatever sentence is imposed is not analogous to LWOP, the harshest sentence that could be imposed on a juvenile. Certainly, engaging in an individual sentencing inquiry, including the consideration of the attributes of youth, would be an "enlightened policy" (see *Woodson*, *supra*, 428 U.S. at pp. 304-305) to apply when sentencing a juvenile defendant to an indeterminate sentence, but it is not an Eighth Amendment imperative after S.B. 260.

The majority reasons that the following quote from *Caballero* supports its conclusion that trial courts must engage in an Eighth-Amendment-compelled individual sentencing inquiry even when the defendant has a realistic opportunity for parole post-S.B. 260: " '[T]he *sentencing court* must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, *so that it can impose a time when the juvenile offender will be able to seek parole from the [Board]*.' (*Caballero, supra*, 55 Cal.4th at pp. 268-269, italics added.)" (Maj. opn., *ante*, at p.47, second italics added.) From this, the majority maintains a penalty selection that comports with *Miller* must be undertaken by the sentencing court. (Maj. opn., *ante*, pp. 47-48.)

The focus of the majority appears to be everything said in the above quoted passage from *Caballero* except the portion I have italicized -- "*so that it can impose a time when the juvenile offender will be able to seek parole from the [Board]*." (*Caballero, supra*, 55 Cal.4th at p. 269, italics added.) This focus overlooks the context in which the *Caballero* court examined this issue and the whole point to *Miller*'s individualized sentencing inquiry requirement. When our state's high court looked at

13

this problem in *Caballero*, there was no statutory parole mechanism in place for juveniles like defendants here.  Thus, in the absence of a change to the sentencing scheme, our high court saw *Graham* and *Miller* being implemented by the only other alternative -- by the trial court at sentencing.  However, as I have pointed out, the *Caballero* court expressly noted that "*Graham*'s analysis does not focus on the precise sentence meted out," but rather on whether juveniles are given " 'some realistic opportunity to obtain release.' " (*Caballero*, *supra*, 55 Cal.4th at p. 268.)  Thus, from an Eighth Amendment perspective, the point of requiring *Miller*'s individualized sentencing inquiry is to determine whether the juvenile offenders crime reflects " ' "irreparable corruption" ' "[4] or "the transient immaturity of youth" (*Montgomery, supra*, 136 S.Ct. at p. 734 [describing the applicable considerations in determining whether to impose LWOP]), and if the latter, impose a sentence that would provide a realistic opportunity for parole.[5]  That is essentially the exercise to which the *Caballero* court referred in the portion of the above text quoted by the majority I italicized.  However, post-S.B. 260, the Eighth Amendment no longer requires California trial courts to determine whether the crime reflects irreparable corruption when imposing an indeterminate sentence because *all* juvenile defendants now have a realistic opportunity for parole, even someone whom the trial court might find at the time of sentencing to be irreparably corrupt.[6]

---

[4]  In *Montgomery*, the Court appears to use the terms "irreparable corruption," "irretrievable depravity," and "permanent incorrigibility" interchangeably to describe the rare juvenile offender for whom an LWOP sentence could be constitutionally imposed. (*Montgomery, supra*, 136 S.Ct. at pp. 726, 733-736, 743-744.)  For consistency, I will use the term "irreparable corruption."

[5]  In *Montgomery*, the Court stated that as a procedural matter, "*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility."  (*Montgomery, supra*, 136 S.Ct. at p. 735.)

[6]  The only people who are excepted from the mandatory parole provisions are juveniles: (1) sentenced to LWOP; (2) sentenced pursuant to the three strikes law in section

On the same page of *Caballero* as the text quoted by the majority is footnote five, where our high court suggested a legislative fix to the constitutional defect in California's sentencing scheme (*Caballero, supra*, 55 Cal.4th at p. 269, fn. 5), a suggestion that the majority appears to ignore. S.B. 260 is the response to this suggestion. But the majority considers S.B. 260 to be a mere " 'safety net.' " (Maj. opn., *ante*, p. 47.) Certainly, the *Caballero* court did not make the suggestion to establish a parole mechanism for the purpose of providing a "safety net," which is not constitutionally compelled. It is not the role of our Supreme Court to make such *policy suggestions* to the Legislature. Our Supreme Court made that suggestion because it believed providing an opportunity for parole would fix the constitutional defect identified in *Miller*. So did our Legislature, and it said nothing in section 1 of S.B. 260 about providing a "safety net."

The majority maintains that their conclusion is bolstered by *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*). (Maj. opn., *ante*, p. 49.) I disagree. *Gutierrez* involved the imposition of a true LWOP sentence, the very sentence imposed in *Graham* and *Miller*. In *Gutierrez*, the issue was the constitutionality of section 190.5, subdivision (b), which authorizes an LWOP sentence for 16- or 17-year-old juveniles when a special circumstance allegation has been found true. Prior case law from the courts of appeal had read that statute to create a presumption that LWOP should be imposed. Our high court held that the statute, properly construed, confers discretion on a trial court to impose life without parole or 25 years to life, with no presumption in favor of life without parole. (*Gutierrez*, at pp. 1360-1361, 1387.) The court further held that "*Miller* requires a trial

---

1170.12, subdivisions (b) through (i); (3) sentenced pursuant to the habitual offender law in section 667; (4) sentenced pursuant to the one strike law for sexual offenders in section 667.61; and (5) who, subsequent to attaining 23 years of age, commit an additional crime for which malice aforethought is a necessary element or for which the individual is sentenced to life in prison. (§ 3051, subd. (h); see Sen. Bill No. 261, eff. Jan. 1, 2016 (Stats. 2015, ch. 471, § 1 (2015-2016 Reg. Sess.)) [amending S.B. 260 to raise the age in the fifth exception from 18 to 23].)

15

court, in exercising its sentencing discretion, to consider the 'distinctive attributes of youth' and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders' before imposing life without parole on a juvenile offender." (*Gutierrez*, at p. 1361.) This is no surprise given *Miller*'s holding that the Eighth Amendment is violated if a juvenile defendant is sentenced to LWOP without considering the factors outlined therein.

In mandating consideration of the *Miller* sentencing factors, the court in *Gutierrez* rejected the People's argument that the newly enacted recall provisions of section 1170, subdivision (d)(2), made application of *Miller* unnecessary.[7] (*Gutierrez, supra*, 58

---

[7] The recall provisions in section 1170, subdivision (d)(2), are substantively different from the mandatory parole consideration provisions in section 3051. Under subdivision (d)(2)(A)(i) of section 1170, a person who was under age 18 at the time of the commission of the offense and sentenced to LWOP may petition to have the sentence recalled after serving at least 15 years. Nothing happens if the prisoner does not file a petition. Certain defendants are statutorily excluded, regardless of the mitigating circumstances. Those excluded include prisoners who tortured their victims and where the defendant's victim was a public safety official. (§ 1170, subd. (d)(2)(A)(ii).) Also, to qualify, section 1170, subdivision (d)(2)(B), requires that defendant's petition state: (1) the defendant had been convicted of felony murder or aiding and abetting murder; (2) the defendant did not have prior juvenile felony adjudications for assault or other felonies "with a significant potential for personal harm to victims"; (3) the defendant committed the offense with at least one adult codefendant; and (4) "The defendant has performed acts that tend to indicate rehabilitation or the potential for rehabilitation, including, but not limited to, availing himself or herself of rehabilitative, educational, or vocational programs, if those programs have been available at his or her classification level and facility, using self-study for self-improvement, or showing evidence of remorse." (§ 1170, subd. (d)(2)(B)(i)-(iv).) If the petition does not include all of this information, the trial court shall return the petition and advise that it cannot be considered without the missing information. (§ 1170, subd. (d)(2)(C).) If the trial court finds by a preponderance of the evidence that statements in the petition are true, then the court must hold a hearing to consider the recall. (§ 1170, subd. (d)(2)(E).) In addition to the facts required for the petition, in deciding whether to grant the petition, the court "may consider" the following facts: (1) prior to the commitment offense, the defendant had "insufficient adult support or supervision and had suffered from psychological or physical trauma, or significant stress"; (2) the defendant "suffers from cognitive

16

Cal.4th at pp. 1384-1385.)  The court reasoned that the recall mechanism "does not eliminate the serious constitutional doubts arising from a presumption in favor of life without parole." (*Id.* at p. 1385.)  Further, the court reasoned that "*Graham* spoke of providing juvenile offenders with a 'meaningful opportunity to obtain release' as a constitutionally required alternative to—not as an after-the-fact corrective for—'*making the judgment at the outset* that those offenders never will be fit to reenter society.' " (*Gutierrez*, at p. 1386, quoting *Graham, supra*, 560 U.S. at p. 75.)  "*Miller*'s 'cf.' citation to the 'meaningful opportunity' language in *Graham*," the *Gutierrez* court noted, "occurred in the context of prohibiting 'imposition of that *harshest prison sentence*' on juveniles under a mandatory scheme." (*Gutierrez*, at p. 1386, italics added.)  The *Gutierrez* court reasoned from the language in *Graham* that it is doubtful the potential to recall an LWOP sentence based on a future demonstration of rehabilitation can make an LWOP sentence any more valid then when it was imposed.  (*Gutierrez*, at pp. 1386-1387.)

---

limitations due to mental illness, developmental disabilities, or other factors that did not constitute a defense, but influenced the defendant's involvement in the offense"; (3) the defendant has performed acts that tend to indicate rehabilitation or show evidence of remorse; (4) the defendant has maintained family ties or connections; and (5) the defendant has no disciplinary actions for violent activities in the last five years in which the defendant was the aggressor.  (§ 1170, subd. (d)(2)(F)(iv)-(viii).)  If the sentence is not recalled, the defendant will have three more opportunities to petition for recall -- at 20 years, 24 years, and 25 years of incarceration.  (§ 1170, subd. (d)(2)(H).)  If the sentence is recalled, the trial court shall have the discretion to resentence the defendant "in the same manner as if the defendant had not previously been sentenced."  (§ 1170, subd. (d)(2)(G).)

Thus, unlike section 3051, there is no guarantee of an opportunity for parole within the defendant's life expectancy because whether there is such an opportunity depends on the length of the new sentence imposed after the LWOP sentence is recalled.  Section 3051, on the other hand, provides a realistic opportunity for parole well within any juvenile defendant's life expectancy.

However, the discussion in *Graham*, *Miller*, and *Gutierrez* was about true LWOP sentences.  As for *Graham*, the judgment *at the outset* to which the United States Supreme Court referred was the *state's* statutory judgment reflected in the imposition of mandatory LWOP sentence, not a sentencing determination by a trial court.  This seems plain, given the reference to the phrase "at the outset" in the context in which it was written in *Graham*:  "The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. *It does forbid States from making the judgment at the outset* that those offenders never will be fit to reenter society." (*Graham, supra*, 560 U.S. at p. 75, italics added.)  As for *Miller*'s " 'cf.' " citation to *Graham*'s " 'meaningful opportunity' " for parole language relating to the "harshest prison sentence," (*Miller, supra*, 132 S.Ct. at p. 2469), that citation helps make the point the *Miller* court sought to make:  a sentence of LWOP, which has the effect of denying a defendant any opportunity for parole *at the outset*, cannot be constitutionally imposed where the defendant is also denied the Eighth Amendment's proportionality requirement of individual sentencing consideration, a requirement born from the Court's adult death penalty precedent.  Neither *Graham* nor *Miller* nor *Gutierrez* said anything about a trial court making a judgment *at the outset* as to the length of an indeterminate sentence when the sentence does not effectively condemn the juvenile offender to die in prison and thus is not analogous to the death penalty.

Indeed, in applying the requirements of *Miller* to section 190.5 LWOP sentences, the *Gutierrez* court specifically noted the death penalty analogy upon which the *Miller* court grounded its individualized sentencing inquiry requirement for juveniles subject to LWOP sentences. (*Gutierrez, supra*, 58 Cal.4th at pp. 1376-1377.)  As I have shown, defendants here have not been sentenced to LWOP or its functional equivalent.  They will be eligible for parole in the 25th year of incarceration.  The death penalty analogy underlying *Miller* simply does not extend to indeterminate sentences post-S.B. 260.  Nor

18

should *Gutierrez* be applied to indeterminate sentences carrying an opportunity for parole.[8]

As I have said, the decision in *Montgomery, supra*, 136 S.Ct. 718, validates the conclusion that S.B. 260 fixed the Eighth Amendment problem in California's juvenile sentencing scheme. In light of *Montgomery*, remand here is unnecessary.

In *Montgomery*, a state prisoner who had been convicted of murder for a killing he committed when he was 17 years old was sentenced to mandatory LWOP some 50 years before *Miller*. Relying on *Miller*, the prisoner sought collateral review. (*Montgomery, supra*, 136 S.Ct. at pp. 725-726.) The high court in *Montgomery* held that *Miller* adopted a new substantive rule of constitutional law that must be applied retroactively to juvenile offenders whose convictions and sentences were final before *Miller* was decided. (*Montgomery*, at p. 736.) Then the Court held that a "State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them. [Citation.] Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." (*Montgomery*, at p. 736) This is exactly what the high court said states *must do* in *Graham* to fix the Eighth Amendment problem. States must "give defendants . . . some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (*Graham*, *supra*, 560 U.S. at p. 75.)

---

[8] I realize that our high court said its "approach" in *Gutierrez* "complements our recent holding in *Caballero* that a trial court must consider many of the same factors when imposing a sentence on a juvenile nonhomicide offender." (*Gutierrez, supra*, 58 Cal.4th at p. 1390.) But this statement says nothing about S.B. 260. Nor does it take into account the death penalty analogy underlying the Eighth Amendment proportionality requirement for an individualized sentencing inquiry in LWOP cases involving juveniles.

The majority seems to conclude that the parole opportunity remedy in *Montgomery* only applies to correct past *Miller* violations on collateral review. (Maj. opn., *ante*, p. 52.) But in holding that the provision of an opportunity for parole fixes the Eighth Amendment problem, the *Montgomery* court cited Wyoming Statutes section 6-10-301(c). That statute provides that juvenile defendants convicted of murder are eligible for parole after 25 years, and it can be applied to current convictions.[9] Section 3051, enacted in S.B. 260 is similar to the Wyoming statute, and it complies with *Graham's* mandate about what states must do to avoid the Eighth Amendment prohibition against cruel and unusual punishment.

Defendant Isaac complains that S.B. 260 could be repealed in the future. The majority expresses the same concerns, asserting that if S.B. 260 were repealed defendants' originally imposed sentences would remain operative. (Maj. opn., *ante*, p. 48.) But it is extremely unlikely that the Legislature would repeal this parole mechanism after a California appellate court declares that the provisions of that measure are what make lengthy indeterminate sentencing of juveniles compliant with the Eighth Amendment. This is particularly true given that the motivation for enacting this legislation was the California Supreme Court's suggestion to enact a parole eligibility mechanism that provides juvenile offenders serving de facto LWOP sentences with the opportunity to obtain release on a showing of rehabilitation and maturity. (*Caballero, supra*, 55 Cal.4th at p. 269, fn. 5.) Furthermore, the prospect of repeal in the face of the legislative findings in section 1 of S.B. 260 explaining why the Legislature enacted its provisions seems too farfetched to even contemplate. And *Montgomery* now establishes

---

[9] Wyoming Statute section 6-10-301(c) as amended in 2013 provides in pertinent part, "A person sentenced to life imprisonment for an offense committed before the person reached the age of eighteen (18) years shall be eligible for parole . . . after having served twenty-five (25) years of incarceration."

20

that on collateral review, a defendant is entitled to an opportunity for a parole hearing, so an outright repeal of S.B. 260 would be ineffective. As a general proposition, I disagree that a reviewing court should base its decision on the hypothetical prospect of repeal of a statute, and that seems especially so here in light of circumstances I have mentioned.

In the highly unlikely event there is a legislative repeal, the constitutionality of that action will no doubt be challenged in court. And any challenge will no doubt point out what the United States Supreme Court said in *Graham* about what states *must do* to make LWOP sentences compliant with the Eighth Amendment. "What the State *must do*, however, is give defendants . . . some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (*Graham, supra*, 560 U.S. at p. 75, italics added.)

Even in the absence of a constitutional imperative, trial courts should consider whatever mitigating information is presented to them by the parties and the probation department. Indeed, it is incumbent upon defense counsel to present mitigating circumstances to the trial court at the time of sentencing, and there are already mechanisms in the law providing such opportunities. (§ 1204 [defendant entitled to sentencing hearing to present mitigating circumstances, including the introduction of sworn testimony]; Cal. Rules of Court, rule 4.437 [allowing defendants to file statements in mitigation prior to the sentencing hearing].) Thus, when trial attorneys do their jobs -- a job that is no different whether individualized sentencing inquiry is constitutionally mandated or not -- trial courts will be required to consider what has been proffered.

However, the Eighth Amendment simply does not require that courts engage in a *Miller*-style individual sentencing inquiry before imposing indeterminate sentences when there is a realistic opportunity to obtain release on parole during the defendant's expected lifetime. To the extent there is a perceived gap in the law, that gap is not for us to bridge in this case.

21

The *Graham* court was clear when it said states must provide an opportunity to obtain release based on demonstrated maturity and rehabilitation, and it was equally clear when it said, "[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance." (*Graham, supra*, 560 U.S. at p. 75.) One option to achieve that goal could be to legislatively require trial courts to engage in *Miller*-style individual inquiry and modify the state's sentencing scheme to allow trial courts to impose specified lower sentences for juvenile offenders. But that is not the option adopted by our state's legislature. Instead, the Legislature opted to establish a parole mechanism, one that kicks in after 15, 20, and 25 years of incarceration depending on the sentence. (§ 3051, subd. (b)(1)-(3).) Under these circumstances, in my view, it is not appropriate for us to require a different option when the option adopted by the Legislature satisfies the Eighth Amendment.

There may be future legislation that establishes a requirement mandating that trial courts engage in *Miller*-style individual sentencing inquiry. I suppose it is even possible that the California Judicial Council could, on its own or in the response to a legislative mandate, augment the Rules of Court discussed by the majority to add special mitigating factors for juveniles facing indeterminate sentences.[10] But these possibilities will be the result of a policy determination, not a federal constitutional requirement. Or it could be that our high court ultimately employs a modified analysis under the California Constitution's prohibition against "cruel or unusual" punishment, requiring trial courts to engage in the specific individual sentencing consideration analysis set forth in *Miller* as

---

[10] I note that trial courts already have the authority to consider factors not set forth in the rules discussed by the majority. California Rules of Court, rule 4.408(a), authorizes consideration of any additional factors "reasonably related" to the sentencing decision. (*People v. Brown* (2000) 83 Cal.App.4th 1037, 1044.)

an extension of California's proportionality analysis.[11]  But for now, the individual sentencing inquiry required by *Miller* is not required.

### E.  Conclusion

In summary, just as the United States Supreme Court banned the imposition of the death penalty on adults without an individualized sentencing inquiry, it also banned the imposition of LWOP on juveniles in homicide cases without individualized sentencing consideration.  In doing so, the court in *Miller* added the various attributes of youth to the factors sentencers must consider in the individual sentencing inquiry.  The focus of the inquiry mandated by *Miller* is the question of whether the offense reflects irrevocable corruption, such that a sentence of LWOP is warranted.  Thus, when considering imposition of an LWOP sentence for a juvenile offender, the Eighth Amendment requires that the trial court consider the factors outlined in *Miller*.  However, post-S.B. 260, no indeterminate sentence can be considered the functional equivalent of LWOP.  Now, when a juvenile defendant is sentenced to an indeterminate term, S.B. 260 provides a realistic opportunity to demonstrate maturity, rehabilitation and fitness to reenter society and thereby obtain release on parole well within any juvenile defendant's expected lifetime.  Thus, there is no Eighth Amendment violation if the trial court does not engage in the individual sentencing inquiry required by the Eighth Amendment in adult death penalty cases and juvenile LWOP cases, no matter how long the indeterminate sentence.  Consequently, defendants' sentences do not violate the Eighth Amendment.

---

[11]  Whereas the Eighth Amendment of the United States Constitution prohibits "cruel *and* unusual" (italics added) punishment, article I, section 17 of the California Constitution prohibits infliction of "cruel *or* unusual" (italics added) punishment.  The distinction in wording is "purposeful and substantive rather than merely semantic."  (*People v. Carmony* (2005) 127 Cal.App.4th 1066, 1085.)  Thus, courts construe the state constitutional provision separately from its counterpart in the federal Constitution.  (*Ibid.*)  However, defendants here did not make a claim under our state constitution.

23

I close with one last observation.  The majority acknowledges that after considering the *Miller* factors, the minimum sentence the trial court can impose on remand here is 45 years to life.  (Maj. opn., *ante*, p. 43.)  But S.B. 260 provides defendants with a parole opportunity after their 25th year of incarceration, regardless of whether the trial court imposes the 45 years to life sentence or some sentence lower than the original sentence, but higher than that minimum.  Indeed, Adam and Isaac will have the benefit of S.B. 260 even if the trial court finds that the offenses here were not the result of transient immaturity, but rather reflect irrevocable corruption.  My point is that both defendants will receive a parole hearing before the 45th year in their life term whatever the trial court does on remand.  Thus, it seems to me that we ask the trial court to engage in an essentially meaningless act.

I would affirm the judgment.


                                    /s/
                            MURRAY, J.


24